DOCKET NO.: 24-12383-CC

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT
_____

**F.E.B. CORP., a Florida Corporation,**

Appellant,

v.

**UNITED STATES OF AMERICA,**

Appellee.

_____

On Appeals from the United States District Court
for the Southern District of Florida
Case No.: 18-10203-civ-Martinez

_____

**APPELLANT'S INITIAL BRIEF**

_____

**TARA A. CAMPION**
**BRUCE S. ROGOW, P.A.**
1199 S. Federal Hwy., #212
Boca Raton, FL 33432
PH: 954.767.8909

**BRUCE S. ROGOW**
**BRUCE S. ROGOW, P.A.**
P.O. Box 749
Cedar Mountain, NC 28718
PH: 954.767.8909

24-12383-CC
*U.S. v. F.E.B. Corp.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-2(b), undersigned counsel hereby certifies that no corporation or publicly held corporation owns 10% or more of F.E.B. Corp.'s stock, and the following is a complete list of all persons and entities known to have an interest in the outcome of this appeal:

1. Bruce S. Rogow, P.A. – Counsel for the Appellant

2. Campion, Tara A. – Counsel for the Appellant

3. Erickson-Pogorzelski, Anthony – Trial Counsel for the Appellee

4. F.E.B. Corp. – Appellant

5. Grey, Michael – Appellant Counsel for the Appellee

6. Rogow, Bruce S. – Counsel for the Appellant

7. United States of America – Appellee

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

This is the third time this case has been before the Court (*F.E.B. Corp., v. United States*, 818 F.3d 681 (11th Cir. 2016) *(FEB I)* (15-11771); *United States v. F.E.B. Corp.*, 52 F.4th 916 (11th Cir. 2022) (*FEB II*) (20-14047)). We are getting closer to answering the Court posed question: "whether the United States had an intended use for Wisteria Island when the United States created it." *FEB II*, 52 F.4th at 927.

Oral argument would assist the Court. The correct answer is found in the lengthy historical record which the court below got wrong. The Subject Property is 39 acres that were created in the early 1940s (21-acres of island, 18-acres of seabed). 2.8 dredged acres, long washed away, were created nearby in the 1920s. Oral argument would aid the Court in determining whether the court below properly applied the historical facts, properly weighed the testimonial evidence in light of the historic documents, properly applied this Court's directive to determine if, when the Subject Property was created, the United States intended to have a use for it.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ............................................C1

STATEMENT REGARDING ORAL ARGUMENT ................................................i

TABLE OF CITATIONS ........................................................................iv

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF THE ISSUES............................................................1

STATEMENT OF THE CASE................................................................2

SUMMARY OF THE ARGUMENT ......................................................3

STANDARD OF REVIEW ..................................................................6

ARGUMENT .....................................................................................9

   I.   THE DECISION BELOW SHOULD BE REVERSED AND TITLE TO
      THE SUBJECT PROPERTY SHOULD BE QUIETED IN FAVOR OF
      F.E.B. .......................................................................................9

         A.    The Mandate's Task: Intent at Creation ...........................10

         B.    Common Sense Queries Undermine the Findings...........................13

         C.    Charlie Hailey .................................................................17

         D.    John Bearce.....................................................................18

         E.    Jennifer Coor...................................................................20

  II.   IRRELEVANT FACTS LED TO CLEARLY ERRONEOUS FINDINGS .20

        A. "Reservations" Do Not Establish Intent at Creation...........................21

B.  Future and Additional Uses Do Not Establish Intent at Time of Creation ............................................................................23

C.  1940 Pre-Dredge Survey Did Not Identify the Subject Property as a Location for Intended Spoil Deposit ...................................................25

III.   IGNORING CONTRADICTORY EVIDENCE LED TO CLEARLY ERRONEOUS FINDINGS............................................................ 26

IV.   THE CONCLUSIONS OF LAW WERE NOT SUPPORTED BY THE EVIDENCE ................................................................................36

CONCLUSION ................................................................................38

CERTIFICATE OF COMPLIANCE.......................................................39

CERTIFICATE OF SERVICE .............................................................39

# <u>TABLE OF CITATIONS</u>

## <u>Cases</u>

*Alaska v. United States*,
   545 U.S. 75, 125 S.Ct. 2137 (2005)..............................................22

*Biden v. Nebraska*,
   600 U.S. --, 143 S.Ct. 2355, 216 L. Ed.2d 1063 (2023)................................16

*Cabriolet Porsche Audi, Inc. v. American Honda Motor Co., Inc.*,
   773 F.2d 1193 (11th Cir. 1985) ........................................................9

*F.E.B. Corp., v. United States*,
   818 F.3d 681 (11th Cir. 2016) *(FEB I)* ........................................i, 2

*Fuhr v. Credit Suisse AG*,
   687 Fed.Appx. 810 (11th Cir. 2017)........................................7, 26

*Harris v. Schonbrun*,
   773 F.3d 1180 (11th Cir. 2014) ...................................................7, 8

*Hawkins v. Ceco Corp.*,
   883 F.2d 977 (11th Cir. 1989) ....................................................7, 8

*Lincoln v. Board of Regents of University System of Georgia*,
   597 F.2d 928 (11th Cir. 1983) ....................................................6, 7

*Pullman-Standard v. Swint*,
   456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982)....................................6

*Teets v. Chromalloy Gas Turbine Corp.*,
   83 F.3d 403 (Fed. Cir. 1996)....................................................7, 20

*U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Management LLC v.
   Village at Lakeridge, LLC*,
   583 U.S. --, 583 U.S. 387, 138 S.Ct. 960 (2018)...........................................6

*United States v. Alaska*,
   521 U.S. 1,  117 S.Ct. 1888 (1997)..........................................21, 22

*United States v. Bailey*,
    100 S.Ct. 624, 444 U.S. 394 (1980)..........................................................11, 12

*United States v. F.E.B. Corp*.,
    52 F.4th 916 (11th Cir. 2022) (*FEB II*).................................................... *passim*

*United States v. U.S. Gypsum Co.*,
    333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)................................7, 20, 26

*Utah Div. of State Lands v. United States*,
    482 U.S. 193, 107 S.Ct. 2318 (1987)..........................................................22

*Ward v. Hobart Manufacturing Co*.,
    450 F.2d 1176 (5th Cir. 1971) ....................................................................7

*Wilkinson v. Garland*,
    601 U.S. 209, 144 S.Ct. 780, 218 L.Ed.2d 140 (2024)...................................6

## **Statutes**

43 U.S.C. §§ 1301 – 1315 ....................................................................................passim

## **Rules**

Fed. Rule Civ. Proc. 52 ...........................................................................................6

## **Additional Sources**

David Crump, "WHAT DOES INTENT MEAN?"
    38 Hofstra L. Rev. 1059 (2010) ..................................................................11

## <u>STATEMENT OF JURISDICTION</u>

This is an appeal from a Final Judgment quieting title in favor of the United States, based on the Findings of Facts and Conclusions of Law entered by the trial court after a bench trial. This Court has jurisdiction pursuant to Title 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

(1)    Did the evidence establish that when the United States created the Subject Property, it created it "for its own use?"

(2)    Did the court below fail to accord the 1953 Submerged Lands Act, 43 U.S.C. §§ 1301 – 1315 its proper force in relation to "Reservations" of the shoals of Key West?

(3)    Did the court below utilize the proper evidentiary construct of "intent" in seeking to determine whether the Subject Property was intentionally created by the United States for its own use?

(4)    Did the court below properly consider all the evidence in arriving at its Conclusions of Law.

1

## STATEMENT OF THE CASE

The third time is the charm. In two prior appeals the Court has addressed the question of the ownership of a dredge spoil property several hundred yards off Key West, Florida. First, the Court found that the statute of limitations barred FEB's quiet title suit, but the Court said that title was still unresolved. *F.E.B. Corp., v. United States*, 818 F.3d 681 (11th Cir. 2016) (*FEB I*) (15-11771). As a consequence, in 2018, the United States brought a quiet title action.

That action was resolved by the district court in favor of the government with the district court's summary judgment holding that discarding dredge spoil was a use under its reading of the Submerged Lands Act "built up for its own use" exception to the Act's guarantee that submerged lands belong to the States.

This Court reversed, holding that merely discarding spoils was not a "use" under the Submerged Lands Act exception. *United States v. F.E.B. Corp*., 52 F.4th 916 (11th Cir. 2022) (FEB II) (20-14047). The case was remanded to the district court to determine whether, when the dredge spoil island was created, the United States had an intended use for it.

After a trial in which the "intent" evidence was historical documents from the 1920s and 1940s surrounding the dredging and creation of the Subject Property, the trial court concluded that the United States placed the spoil in the 1920s and again in the 1940s:

2

> [W]ith the intent to use the Subject Property in the
> following ways: non-use (or non-development by private
> parties); a protective feature, protecting nearby naval
> facilities; and as a site for possible future physical
> improvements in support of military defenses.

Doc 155, p. 22.[1]

FEB challenges that Finding as clear error which, given the statutory standard, this Court can review independently.

The Finding is belied by the documentary evidence and confirmed by the undisputed fact that for 100 years the United States did not use the dredge spoils nor, despite knowledge of, and being aware of the State's claim to ownership, the United States knowingly failed to secure title which was offered to it by the State, simply by providing the metes and bounds of the spoils.

## SUMMARY OF THE ARGUMENT

The Government had the burden to prove, by a preponderance of the evidence, that the 1920-1923 2.8-acre spoil pile and the 1940-1943 39-acre Subject Property – Wisteria Island – was intentionally created for its own use, i.e., built up specifically to be "used" by the United States. In this Court's words, was the land "filled in" to

---

[1]     Pursuant to 11th Cir. R. 28-5, references to the record appearing in this Initial Brief are to the document and page number that appear in the header generated by the district court's electronic filing system, i.e. "Doc --, p. --_."

     The trial transcripts are comprised of Volume I (Doc 149) and Volume II (Doc 150). The government introduced Exhibits 1-24; FEB introduced Exhibits 100-252 (with omissions); Joint Exhibits were introduced as J-1 to J-83.

be "'convert[ed]' to the United States's 'service.'" *FEB II*, 52 F.4th at 926-927. That question addressed the 1953 statutory Submerged Lands Act standard: that the States had title to and ownership of lands beneath navigable waters within three miles of their shores except for "*all lands filled in, built up, or otherwise reclaimed by the United States for its own use.*" 43 U.S.C. §1313(a) (emphasis supplied).

The government failed to prove that between 1920 and 1923, the United States intentionally created a 2.8-acre spoil island for its own use. The shipping channel expansion project benefited the Navy, but the dredged spoil pile did not have an intended use. It was leased to a shark fishing company in 1928. In June 1926, the Judge Advocate General disclaimed any use:

> The Navy Department has in contemplation no naval use that is likely to be made of this property in the near future and as it is in an isolated location the industry of the Ocean Leather Company is not likely to become offensive or objectionable and a revocable agreement might be entered into unless there is sufficient reason to the contrary. [Ex 123, see also, Ex 122, 124, 126]

Those spoils had washed away to 1.7 acres by 1940. The 39-acre Subject Property – Wisteria Island – was a different dredge spoil pile created in the early 1940s.

As to that 39-acre Subject Property, the historical documents establish that there was no intended use at the time of creation; there was no evidence of the land being filled in to be used or converted to the United States's service. Indeed, at the

time of creation not only did the United States disclaim any intended use of the Subject Property, it declined an invitation from Florida to accept the property as its own in the 1940s. And in the 1950s, after the enactment of the Submerged Lands Act a Navy historical analysis of the facts of the 1940s dredge spoil creation of Wisteria concluded that Wisteria Island was not created to be used for any purpose other than a place to deposit discarded dredge spoils and thus was not created to be "used" by the Government.[2]

The error of the court below was in making findings of fact that were belied by the historical undisputed documentary evidence. Rather, the court below was swept away by the testimony of an architecture professor who did not think that the Submerged Lands Act should be considered because in his view: "Yes, just specifically the spoil being deposited there is a use." Doc 149, p. 120:23-24. His 2024 opinions shed no light on the intent at creation and were belied by both the historical documents and the testimony of an Army Corps of Engineer employe with access to the actual records of the 1940s dredging process. His testimony was that Wisteria was a "pitch and shovel" creation, digging and discarding. and he found no documents or evidence of an intended use for the spoils.

---

[2]    As this Court said in *FEB II* – discarding dredge spoils is not "an intent of future use." 52 F.4th at 927.

The Findings below present a mixed question of law and fact. They failed to satisfy the statutory SLA exception standard with regard to the Subject Property. They should be reversed and judgment entered for F.E.B. Corp. as to the Subject Property.

## STANDARD OF REVIEW

This appeal presents a mixed question of historical facts and statutory law. *Wilkinson v. Garland*, 601 U.S. 209, 223, 144 S.Ct. 780, 218 L.Ed.2d 140 (2024). A mixed question asks "whether the historical facts [ ] satisfy the statutory standard." *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Management LLC v. Village at Lakeridge, LLC*, 583 U.S. --, 583 U.S. 387, 394-395, 138 S.Ct. 960 (2018) (citing *Pullman-Standard v. Swint*, 456 U.S. 273, 289, n. 19, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982)).

The statutory standard here is whether the Subject Property – Wisteria Island – was "built up . . . by the United States for *its own use*." 43 U.S.C. 1313(a) (emphasis supplied). The test, established by this Court, is "whether the United States had an *intended* use for Wisteria Island" when it created it. *United States v. F.E.B. Corp.* (*FEB II*), 52 F.4th 916, 927 (11th Cir. 2022) (emphasis supplied).

Findings of fact are reviewable for clear error, and conclusions of law, de novo. Fed. Rule Civ. Proc. 52(a). "A finding of fact is clearly erroneous if the record lacks substantial evidence to support it." *Lincoln v. Board of Regents of University*

*System of Georgia*, 597 F.2d 928, 939 (11th Cir. 1983) ("Even if substantial evidence supports a finding, [the Court] must consider the evidence as a whole and set it aside if [it is] left with the impression it is not the truth and right of the case.") (citing *Ward v. Hobart Manufacturing Co.*, 450 F.2d 1176, 1182-1183 (5th Cir. 1971)).

While appellate courts do not "ordinarily review the factfinder's determination of credibility" they may do so where they are left "with the definite and firm conviction that a mistake has been committed." *Fuhr v. Credit Suisse AG*, 687 Fed.Appx. 810, 818 (11th Cir. 2017) (factual finding was clearly erroneous when district court relied on a perceived inconsistency in the evidence that did not exist); *Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403, 406-407 (Fed. Cir. 1996) (the district court committed legal error by focusing on irrelevant facts); *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct, 525, 542, 92 L.Ed. 746 (1948) (trial court's findings were clearly erroneous where testimony was in conflict with "contemporaneous documents"). Here, "credibility" was not the key. The key was what the historical documents did not say.

As part of a de novo review, the Court will "correct errors of law, including misapplications of law to fact and factual findings predicated on legal errors." *Renteria-Marin v. Ag-Mart Produce, Inc.*, 537 F.3d 1321, 1324 (11th Cir. 2008). An appellate panel reviews de novo "a district court's ruling on the interpretation and application of a statute." *Harris v. Schonbrun*, 773 F.3d 1180, 1182-1183 (11th Cir.

7

2014) (internal citations omitted); see also *Hawkins v. Ceco Corp*., 883 F.2d 977, 986, n. 4 (11th Cir. 1989) (appellate courts make independent determinations of legal inferences from facts and of applications of law to facts).

This is a case of first impression where the statutory standard to be applied was pronounced by this Court in an earlier opinion involving these parties and this property. The historical documents are undisputed. All that remains is the legal issue of intent at creation, and *de novo* review by this Court is appropriate.

**ARGUMENT**

## I.    THE DECISION BELOW SHOULD BE REVERSED AND TITLE TO THE SUBJECT PROPERTY SHOULD BE QUIETED IN FAVOR OF F.E.B.

The Subject Property – 39 acres – is the product of dredge spoils and the surrounding seabed. In its Findings of Fact the court below concluded, *inter alia*: "the United States placed spoil on the subject property with federal use in mind, including non-use as a protective feature." Doc 155, p. 22, ¶131. It continued: "Accordingly the evidence establishes that when the United States placed spoil on the Subject Property in the 1920s and again in the 1940s, it did so with the intent to use the Subject Property in the following ways: non-use (or non-development by private parties); a protective feature, protecting nearby naval facilities; and as a site for possible future physical improvements in support of military defenses."[3]

There is evidence that supports a finding that in 1924 2.8-acres of dredge spoil were placed by the Navy and leased, in 1928, to a tenant. More than an acre of that spoil pile had washed away by 1940. But there is no evidence that that spoil pile, or the 39-acre Subject Property was intended, when they were created in the 1920s or

---

[3]    Those "findings of fact," along with the other 132 Findings of Fact were all taken, virtually verbatim (including typographical errors) from the United States of America's Updated Proposed Findings of Fact and Conclusions of Law, Doc 152. See *Cabriolet Porsche Audi, Inc. v. American Honda Motor Co., Inc.*, 773 F.2d 1193 (11th Cir. 1985) (disapproving of the practice).

1940s, to serve any use by the United States. (Except to use as a location to place spoil during a dredging operation, which this Court has held is not a "use" under the "built up for its own use" statutory standard. *FEB II* at 919-920).

## A.    <u>The Mandate's Task: Intent at Creation</u>

This Court's mandate was: "[t]o determine whether the United States had an intended use for Wisteria Island when the United States created it." 52 F.4th at 927. The statutory standard called for specific intent: "built up for its own use."

> We begin with the word "for." "For" in this context requires intent. The fourth edition of *Black's Law Dictionary* – published in 1951 – defined "for" at least in part as "[t]he cause, motive or occasion of an act, state[,] or condition." *For, Black's Law Dictionary* (4th ed. 1951). And the *New International Dictionary* of the same era described it similarly. *For, New International Dictionary* (1952) ("having as goal or object; in order to be, become, or act as"). Cf. *Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto. Aerospace & Agric. Implement Workers Loc. 787*, 523 U.S. 653, 656, 118 S.Ct. 1626, 140 L.Ed.2d 863 (1998) ("It is true enough … that one of the numerous definitions of the word 'for' is … '[w]ith the purpose or object of.'") (citation omitted). The contemporaneous dictionaries then, establish that land is filled in "for" the United States's use when the land is filled in "with the purpose or object" that the United States will use it – in other words, not accidentally.
>
> The other key word is "use." "Use," in the 1950s, had a broad definition. The fourth edition of *Black's Law Dictionary* defined "use" as "to make use of, to convert to one's service, to avail one's self of, to employ" and as the "act of employing everything, or state of being employed, application; employment, as the use of a pen, or his machines are in use. Also the fact of being used or

10

employed habitually[.]" *Use, Black's Law Dictionary* (4th ed. 1951). The 1952 *New International Dictionary* defined "use" as "to convert to one's service, to avail oneself of"'; to "engage in, carry one, indulge in" and "function." *Use, New International Dictionary* (1952). "Use" then, can really mean any utility, any way in which the filled in land is "convert[ed]" to the United States's "service."

\*\*\*

The difference between storage and discarding is, in our view, an intent of future use.

*Id*. at 926-927.

Intent refers to "[t]he state of mind accompanying an act." *Black's Law Dictionary* (11th ed. 2019). But what does "intent" mean in the context of this case, and how does one measure "intent" in determining "for its own use," the language of the SLA exception? The SLA exception, as viewed through the lens of its particular language ("for its own use") means "intent as purpose." *Cf*. David Crump, "WHAT DOES INTENT MEAN?" 38 Hofstra L. Rev. 1059 (2010).

This Court used "intent" and "purpose" interchangeably. See generally, *FEB II*. The Supreme Court has held that "[i]n a general sense, 'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent." *United States v. Bailey*, 100 S.Ct. 624, 631, 444 U.S. 394 (1980) (internal citations omitted) ("[A] person who causes a particular result is said to act purposefully if he consciously desires that result . . . while he is said to act knowingly if he is aware that that result is practically

11

certain to follow from his conduct."). Therefore here, "purpose" requires "specific intent," that is, what was the United States's specific intent (purpose) at the time it created Wisteria Island.

The language of *FEB II* – "*intent at the time* it built up," "*intent at the time* of filling in or building up," "*intent at the time* it was created" – provided guidance to the court below. Objective intent applied here. The "intent" and "purpose" the United States needed to prove was that which existed *contemporaneously* with the creation of the island. Contemporaneous, "occurring … *at the same time*." *Black's Law Dictionary*, (11th ed. 2019) (emphasis supplied).

The inquiry below was whether there was a specific purpose that motivated the creation of Wisteria – the Subject Property; a specific purpose beyond just disposing of dredge spoils. Put another way, was there a state of mind intent to deposit the dredge spoils with a contemplated future use in mind, both in the 1920s and the 1940s.

The proofs of intent, or lack of intent to "use" were the recorded actions or inactions memorialized in documents created at the time of conception. They are the only evidentiary record – i.e., "circumstantial evidence" – that is available.

Here, the circumstantial evidence was contained in over 200 exhibits, many of which were joint. The live witness testimony, of course, could not speak to the intentions of the United States in the 20s or the 40s. Those testimonies did not

challenge the historical record. The "silences" of the historical record also speak volumes.

The court below found there were "intended uses" at the time of the 1920s creation of the 2.8-acre island, and the 1940's 39-acre Subject Property. Thus, it concluded that the Subject Property was "built up" for the United States' own use.

> Finding 132.        Accordingly, the evidence establishes that when the United States placed spoil on the Subject Property in the 1920s and again in the 1940ss, it did so with the intent to use the Subject Property in the following ways: non-use (or non-development by private parties); a protective features, protecting nearby naval facilities, and as a site for possible future physical improvements in support of military defenses.

Doc 155, p. 22. The historical record does not support that Finding of Fact.

### B.    **Common Sense Queries Undermine the Findings:**

Why, if the United States Navy had a specific intent to build up the Subject Property "for its own use" during the 1920s and 1940s dredge projects, did it:

> (1)    *fail to* articulate any proposed *use* for the dredge spoils;
>
> (2)    *fail to* articulate any *use* for the Subject Property dredge spoil when it, in October 1941 made an application to the State of Florida Trustees of the Internal Improvement Fund to deposit fill material on State owned lands [Ex 42];
>
> (3)    *fail to* provide to the Trustees of the Internal Improvement Fund the metes and bounds

13

description of the Subject Property in response to the Trustees unequivocal agreement "to give the Navy Department the spoil areas desired upon receipt of metes and bounds description of the areas involved." [Ex 150];

(4)    *fail to* provide the Subject Property metes and bounds despite having done so for four other dredge spoil areas – Fleming Key, Salt Pond Key, Spoil Area North of Fleming Key, and Trumbo Point – all of which were dredge spoils which were planned for specific Navy uses and which were deeded to the Navy by the Trustees upon receipt of the respective metes and bounds [Ex J-49];

(5)    *fail to* designate the Subject Property as a spoil location for future maintenance dredging as it, in 1943, did for other dredge spoil areas [J-40, 34-38];

(6)    *fail to* take any action in 1951 when the Trustees proposed to sell the Subject Property, other than to write and claim ownership, saying "the strategic location of this spoil area makes its use for military purposes highly possible, and its use for a fuel storage area is now under consideration." [J-57];

(7)    *fail to* take any action to resolve title when in 1952 the Florida Attorney General approved the Trustees' sale, noting the Navy's claim and writing "if litigation ensues [the buyer] will be in position to defend the title. In this manner we can get the question of title settled one way or other in case the Navy decides to litigate with him." [Ex J-60];

14

(8)    *fail to* find, in 1953 – 1954, after passage of the Submerged Lands Act's "built up for its own use" exception, any evidence that the Subject Property had been built up for its own use, including the August 1956 Chief of Bureau of Yards and Docks conclusion that "the Navy would have a difficult time in proving that this island was built up for Federal use, in as much as the records indicate that the only reason for the establishment of the island in 1943 was a site for the deposit of spoil. It appears, therefore, that it will be necessary to acquire this island by condemnation proceedings." [J-74];[4]

(9)    *fail to* seek to acquire the Subject Property through condemnation proceedings although it did acquire an adjacent island which had been the product of the same 1940s dredging, and the Final Judgment and Declaration of Taking stipulated that the State held legal title to those dredge spoils after the passage of the Submerged Lands Act [Ex 230; 250];

(10)    *fail to* take any action to secure, settle, or resolve the title to the Subject Property until it filed the Quiet Title action in 2018, prompted by this Court's statement in *FEB II*: "[t]he title dispute remains unresolved." 818 F.3d at 693-694.

\*\*\*

---

[4]    And in December 1956 the Commanding Officer of the U.S. Naval Station, Key West, after an exhaustive search wrote "[t]he subject land was deposited as spoil incidental to the deepening of the ship channel. There is nothing locally to indicate whether or not it was the intent to use the island after it was created." [J-76, J-77]

15

The Findings of Fact and Conclusions of Law are contrary to common sense. If the Subject Property was so important for "security," for "storage" (as opposed to "discarding"), "for future land development" by the Navy, for "future physical improvements," to "augment the protection the Subject Property provided for Navy operations from both natural and manmade incursions" (see Findings of Fact 128 – 132); if the Subject Property was so important and "valuable to the Navy because of its proximity to naval operations and its usefulness as a barrier against hurricane and tidal threats to the naval operations and against private development of the area" (Conclusions of Law 17), would not the United States have taken all necessary steps to secure title and ownership of the Subject Property in the 98 years between 1920 and 2018? Especially when, in 1943, the United States only needed to provide metes and bounds to the Trustees of the Internal Improvement Fund and the Subject Property's ownership would have been resolved.

"Common sense" counts. See *Biden v. Nebraska*, 600 U.S. --, 143 S.Ct. 2355, 2378, 216 L. Ed.2d 1063 (2023) (Barret, J. concurring). Common sense says a party would not wait nearly 100 years to resolve a question that was allegedly so important to the Country's security and the Navy's mission.

All of the Exhibits in this case were unopposed, 85 were joint. The court below, adopting the Government's Findings and Conclusions *in toto* did not ask the

16

"common sense" questions. Nor did it address the Government witnesses whose testimonies made the F.E.B. points.

### C.   **Charlie Hailey**

The trial court's Findings of Fact of "use" for the Subject Property were derived from the testimony of one witness – Charlie Hailey, a Professor of Architecture at the University of Florida, author of a 2013 book on spoil islands, who opined on Wisteria Island generally in a chapter of the book.

Hailey was unaware of the fact that the Navy had passed on the opportunity to take title to the Subject Property dredge spoils in 1944 (see discussion at p. 28-29, *infra*). He did not think the Submerged Lands Act or this Court's Opinions on Wisteria were relevant:

> Q.    Do you think that your opinion about the use of Wisteria Island should be considered in light of the Submerged Lands Act?
>
> A.    I don't think so, in context of the book, and in context of my opinion.
>
> ***
>
> Q.    Do you know what the test is that the Eleventh Circuit set forth for determining whether or not Wisteria Island falls under the Submerged Lands Act?
>
> A.    I don't.

Doc 140, p. 99:1-25.

17

Hailey had looked at documents relating to the 1924 two-acre dredge spoil and saw dredge spoil placement as a use and that because Wisteria was dredge spoils, it was a use: "yes just specifically, the spoil being deposited there is a use." Doc 149, p. 120:3 – 24. Asked if non-use is a use, he said "yes." *Id*. Hailey constructed speculative scenarios of use, sans any evidence that such uses were contemplated when the Subject Property was created in 1940 – 1943.

His *ipse dixit* "uses" were belied by the facts of no intent at the time of creation.

### D.    **John Bearce**

The government's expert witness, John Bearce, the Navigation Operations Manager, Army Corps of Engineers, who has been employed with the Corps Jacksonville District for 33 years, was "charged by the government with doing research on Wisteria Island and the dredging operations for Wisteria Island . . . for the entire history since before the 1900's until the present." Doc 150, p. 62:12-25. Bearce testified that he was hoping to find documents that spelled out the exact history of Wisteria and would explain all the details, but he did not find any such documents. *Id*. at 63:23 – 64:4.

When asked if he was able to find records relating to the "why" of the creation of Wisteria Island, Bearce answered:

18

A:    No. . . in my mind . . . I was not questioning the why
the spoil       mounds were created because in my
mind, being involved until [*sic*] in dredging for
many years, that I was under the assumption that at
least part of the why question is answered by the
fact that when you do a dredging project, you have
to have some place to place the material. . . .

Q:    And did you use a pick and shovel analogy in
explaining    your position?

A:    Yes, I did. I used that … analogy to explain that in
dredging, in order to provide the most efficient – in
terms of dollars       spent the most efficient type of
dredging project, that one of the parameters would
be to place the spoil as near to the dredging area as
possible.

Q:    And that is your pick and shovel analogy. You're
digging a ditch and you have to put what you dug
somewhere.

A:    That is correct.
                                ***
Q:    And do you recall my question, did you find any
record or statement that stated any purpose other
than the pick and   shovel analogy?

A:    Yes, I did not find any documents.

Q:    And did you say that if you had found that, you
would feel like you had struck gold?

A:    Yes, I did say that and yes, I would have been happy
to find some documents that spoke to the details of
this issue.

*Id*. at 64:8 – 66:3.

19

### E.    Jennifer Coor

Jennifer Coor was a government witness and appeared on behalf of the Army Corps of Engineers. When asked: "Generally, how is the place to deposit the dredge spoils chosen [before 1970]?" She answered: "Typically the closest, cheapest, easiest location is where we would dispose of material. So adjacent property would be ideal." Doc 149, p. 194:23-195:4. She further testified:

> Q:    When the dredging was done in 1923, are there records that reflect the reason why the dredge spoils were placed where they were?
>
> A:    Not that I have seen.
>
> Q:    When the dredge spoils were placed in 1941 to 1943, were  there reasons set forth as to why they were placed where they were?
>
> A:    No. . .

*Id*. at 195:9-16.

## II.    IRRELEVANT FACTS LED TO CLEARLY ERRONEOUS FINDINGS

The trial court erred by focusing on irrelevant facts to find the United States had an intended use for Wisteria Island when it created it.  *Teets v. Chromalloy Gas Turbine Corp.*, 83 F.3d 403 (Fed. Cir. 1996); *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct, 525, 542, 92 L.Ed. 746 (1948) (findings are clearly erroneous when based on immaterial facts).

20

### A.    "Reservations" Do Not Establish Intent At Creation

Findings 5-15 are labeled under subheading: "*B. The Navy's Repeated Reservation and Use of the Subject Property from 1845-1908*." Doc 155. p. 3-4 (emphasis in original).[5]

Findings 53 – 63 are listed under subheading "*E. Florida Attempts to Sell the Island Created for the Navy's Use on the Subject Property; the Navy Objects; and, in response to Florida's Attempted Sale of the Island, the President Executes a New Executive Order Reserving the Subject Property for the Navy's Use*." *Id*. at 9.

Conclusion 19 states in part that "the United States reserved [the Subject Property] for the Navy's use." *Id*. at 25, ¶19.

The court erred by relying on "naval reservations" to infer intent at creation in 1923 and 1943. "Reservations" do not trump the Submerged Lands Act.

In *United States v. Alaska*, 521 U.S. 1,  117 S.Ct. 1888 (1997), the United States asserted ownership to submerged lands off the coast of Alaska. The Court held that the SLA required that title passed to the States unless the "United States '*expressly* retains them'" (*id*. (emphasis in original)).

> States enjoy a presumption of title to submerged lands . . . beneath territorial waters within three nautical miles of their coasts. This presumption flows from two sources. Under the established rule known as the equal-footing

---

[5]    While the subheading includes "Navy's … *Use* of the Subject Property," Findings 5-15 fail to identify any use of the Subject Property by the Navy during this time period.

> doctrine, new States enter the Union on equal footing with the original 13 Colonies. . . . [and] Under the Submerged Lands Act . . . the presumption of state title to lands beneath navigable waters within the boundaries of the respective States is 'confirmed' and 'established.' 43 U.S.C. § 1311(a).

*Alaska v. United States*, 545 U.S. 75, 78-79, 125 S.Ct. 2137 (2005) (internal citations omitted); see also *Utah Div. of State Lands v. United States*, 482 U.S. 193, 107 S.Ct. 2318 (1987).

The "reservations" put forth by the government and adopted by the court below were irrelevant to the Submerged Lands Act question of intent at time of creation.

Executive Order 4060 [J-29] (August 11, 1924) was entered in response to the State of Florida's attempt to sell the 2.8-acre spoil island that resulted from the 1920s dredging project. The language of EO 4060 provided "all of the islands, keys and shoals" located in the vicinity of Key West "are hereby reserved for use of the Navy Department for naval purposes, subject to any existing vested rights in and to the same." That language, had it been in effect prior to March 3, 1845, would not have defeated the State's title to its submerged lands. See *Utah* and *United States v. Alaska*, *supra*.

The government contended that the evidence in this case showed the the United States reserved the area of the Subject Property for military use from time immemorial. In fact, the Navy consistently made this argument as the basis for its

22

claims to the area when it challenged the State of Florida's proposed sales of the 2.8-acre island in 1924 and the 20-acre islands in 1953. [See, i.e., Ex 4, J-22, J-24; J-57, J-58, J-59, J-90]. However, the reservation argument does not carry the day for the government. Neither executive order presented in this case was in effect prior to Florida entering the Union and neither contained language sufficient to defeat Florida's entitlement to the land.

A general reservation for military purposes does not constitute the requisite level of intent for a specific purpose or use of the dredge spoils at the time they were created. None of the reservations utilized by the court below vested title to the Subject Property in the United States, nor did they establish an intent, in 1923 or 1943, to create Wisteria Island for a particular purpose.

### B. Future and Additional Uses Do Not Establish Intent at Time of Creation

The court made other clearly erroneous findings based on irrelevant or immaterial facts.

Finding 70, under subheading "*F. The Navy Used the Subject Property for Repeated Deposits of Spoil and for Additional Purposes*" states:

> As an example of the Navy exercising control and ownership over the Subject Property after it was filled in, the United States, by and through the Secretary of the Navy, entered into a Revocable License with Lowe Fish Company on August 17, 1928, for use of the "exposed spoil bank" (i.e., the Subject Property), "for the purpose of carrying on certain processes of preparation of hides in

23

connection with the shark fishing industry." Doc 155. p. 13, ¶ 70

The significance attributed to the Lowe Revocable License is overstated. Ex J-34. The veracity of the License is not at issue; Navy "use" in 1928 does not address intent at time of creation in 1923.

Findings 93 – 95, under subheading "*H. Florida Issues a Quitclaim Deed to the Subject Property Over the Objection of the United States Even Though It Did Not Hold a Colorable Claim to the Subject Property*," are accounts of the Navy's objections, in 1951, to the sale of Wisteria Island based on its potential future usefulness.

Findings 122 – 127, under subheading: "*K. Additional Uses and Plans to Fill the Subject Property After 1960*," account for plans the Army Corps of Engineers had for Wisteria in 1966.

None of these facts are relevant or material to the question of the United States intent in the 1920s and 1940s. As this Court noted, "our focus must center on why the land was built, post-creation use (or lack thereof) isn't dispositive." *United States v. F.E.B. Corp. (FEB II)*, 52 F.4th 916, 931 (11th Cir. 2022).

Conclusion of Law 20 states "the Navy had additional plans to develop the Subject Property and place physical structures on the property." This conclusion references plans for the island *after* it was created. The fact that the Navy thought

Wisteria might be useful in the future, *after it already existed*, is not the test established by this Court.

The court below erred by relying on facts that were irrelevant or immaterial to the question of the United States' intent when it created the Subject Property in 1923 or 1943.

## C.    1940 Pre-Dredge Survey Did Not Identify the Subject Property As a Location for Intended Spoil Deposit

Findings of Facts 76 stated that: "[t]he Subject Property was specifically identified as, and intentionally used as, 'spoil area B' during the 1943 channel and turning basin project." Not so.

In 1940, the Army Corps of Engineers conducted a pre-dredge survey of the waters surrounding Key West as part of the Key West Harbor project. The pre-dredge survey identified various *areas* to be used as spoil deposits during the dredging. One of those *areas* was "Spoil Area B," in which 1.7-acres from the 1920s remained. Spoil Area B "show[ed] us the X and Y longitudinal and horizontal extends of the area where the dredgers can place the spoil." Doc 149, p. 184:4-5 (testimony of Dr. Jennifer Coor). The dredgers were free to place the spoil anywhere within the designated areas. The 39-acre Subject Property occupied only a portion of the much larger Spoil Area B, and was laid near, not on top of, what remained of the 1920s pile.

25

### III.    IGNORING CONTRADICTORY EVIDENCE LED TO CLEARLY ERRONEOUS FINDINGS.

A finding is clearly erroneous when it is based on witness testimony in conflict with "contemporaneous documents" or when it is refuted by "uncontradicted evidence." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct, 525, 542, 92 L.Ed. 746 (1948); see also *Fuhr v. Credit Suisse AG*, 687 Fed.Appx. 810, 818 (11th Cir. 2017) (not published) (in "narrow" decision, Court held that findings based on selected evidence while disregarding contradictory documents were clearly erroneous).

The Findings of Fact reflect the district court's disregard for contradictory and inconsistent-with-its-findings evidence.

Findings 50 – 56 discuss the Navy's interest in the 2.8-acre island for sale in 1924, and its subsequent request for a reservation of the area. In particular, Findings 50 – 51 seek to convey that the Navy objection to the sale by the State evinced a recognition of the Navy's claim to the Subject Property. Not so. The Findings *omitted* TIIF's May 16, 1924 response disputing the Navy's basis for title, writing, *inter alia*:

> Neither of the authorities cited by you would affect the title of the State to this particular island, unless it was above ordinary high water on March 3, 1845. If this particular piece of land, or what is known as "FRANKFORT BANK" was below the surface of ordinary high water on March 3, 1845, then the title became vested in the people of the State of Florida, and

26

under the Laws of Florida the Trustees would have the
right to sell the same at this time.
[Ex J-24]

Findings 81 and 86 are listed under subsection "*G. The United States Fills in
and Builds up the Subject Property Again in the 1940's for the Navy's Use*." But
omitted from the Findings was dispositive information contained in the 1943 Army
Corps of Engineers post-dredge survey, specifically that the ACOE identified areas
to serve as future spoil storage locations, but Wisteria Island *was not* among them:

> In 1943, the ACOE prepared a post-dredge survey for the
> 30-Foot Channel & Turning Basin Project at Key West
> Harbor. The survey identified several spoil areas as
> locations for future "Maintenance Dredging." [Ex J-40,
> 34-38]
>
> Wisteria Island was not designated as a spoil location for
> future maintenance dredging. [Ex J-40 at 34].

Subsection G's Findings fail to address Navy statements disdaining use as
early as 1926:

> On June 4, 1926, the Judge Advocate General wrote to the
> Commandant of the Key West Naval base relating to a
> license for a shark fishing company's commercial use of
> the 2.8-acre spoil island, stating: "*The Navy Department
> has in contemplation no naval use that is likely to be made
> of this property in the near future and as it is in an isolated
> location the industry of the Ocean Leather Company is not
> likely to become offensive or objectionable and a
> revocable agreement might be entered into unless there is
> sufficient reason to the contrary*." [Ex 123; see also, Ex
> 122, 124, 126] (emphasis supplied); [see also Ex 130,
> 131].

27

Findings 103 – 116 fall under subheading: "*I. Congress Passes the SLA Only After it Adds the Exception Requested by the Navy to Exclude the Subject Property from Operation of the SLA.*"

Finding 108 states:

> 108.  [Secretary Anderson] explained the Navy's concern over the proposed legislation, and need for amendment of the proposed legislation, which at the time already made an exception for lands to which title had been acquired . . .

The Findings below utterly fail to address the opportunities the Navy had *vis a vis* acquiring title to dredge spoil piles and its failure to do so with regard to the Subject Property.

> In October 1941, Navy Lieutenant A.J. Fay made an application to the State of Florida Trustees of the Internal Improvement Fund to deposit fill material from the dredging projects on certain State-owned land in the vicinity of Key West. [Ex 142]
>
> ***
>
> The TIIF granted the Navy's request. [Ex 142]
>
> ***
>
> On January 10, 1942, the Commandant, Naval Operating Base, Key West, advised the Judge Advocate General that:
>
> > *The State of Florida has agreed to give the Navy Department the spoil areas desired, upon receipt of metes and bounds description of the areas involved.* As this surplus dredged material has not been deposited in the spoil area it is not possible to secure an accurate metes and bounds description of the areas involved. Section 1061 of the Revised General

28

Statutes of the State of Florida in regard to
sovereign land claims title to areas under non-
navigable bodies of water covered by water three
feet or less in depth and separated from the
mainland by a channel five feet or more in depth. In
view of the foregoing, it is believed that title to the
entire area covered by the Naval Air Station
development should be acquired in addition to the
area now reserved for naval use under Executive
Order 808 of June 8, 1908. Acquisition of title by
the Government of such an area would permit a
more flexible arrangement by which the spoil areas
could be located to the best advantage during
construction operations.  [Ex 150]

*\*\**

On July 6, 1944,  the Navy obtained metes and bounds
descriptions for four spoil areas completed during the
dredging projects: Fleming Key spoil area, Salt Pond Key
spoil area (Dredgers Key), Spoil area north of Fleming
Key, and Trumbo Point spoil area. [Ex J-44]

*\*\**

On November 27, 1946, TIIF executed a deed to the Navy
conveying the four dredge spoil areas: Fleming Key, Salt
Pond Key, Spoil area north of Fleming Key, and Trumbo
Point. [Ex J-49]

*\*\**

*The Navy never obtained metes and bounds description for Wisteria Island;*

*the Navy never sought a deed for Wisteria Island from TIIF.*

A review of the documents omitted from the Findings of Fact establish that

had the Navy wanted title to the 39-acre spoil island [Subject Property] created

during the 1940s seaplane dredging operations, they could easily have acquired title.

*\*\**

29

Findings 117 – 121 are under subheading "*J. The Navy Continues to assert Its Claims of Ownership Over the Subject Property After Passage of the SLA*." They touch upon post-SLA efforts by the Navy to determine ownership of Wisteria.

> 117. On September 15, 1953, Admiral Jelley sent a letter to the Bureau of Land Management (BLM) asking BLM to investigate ownership of the Subject Property and advise the Navy "on the validity of the Federal Government's claim to ownership of the area."
>
> \*\*\*
>
> 121. "In 1954, the Navy asked the Bureau of Land Management about its claim to Wisteria Island, explaining that Wisteria Island and the area around Frankfort Bank were of great strategic importance. The Navy asserted that Wisteria Island was close to highly classified Naval activities, and it would be a security risk to allow the island to fall into the hands of private individuals." *FEB II*, 52 F.4th at 923 (internal quotation marks omitted).

These inquiries were answered. The answers *were not included* in the Findings of Fact. Omitted from the chronology are the following facts:

> On September 23, 1953, BLM responded to Admiral Jelley and advised that "the matters presented in your letter, and the questions raised, will require and extended amount of search of the records for a proper answer." [Ex 199]
>
> \*\*\*
>
> On November 20, 1953, BLM Director Woogsley responded to Admiral Jelley and advised:
>
> > It would appear that the validity of the Government's claim to these islands must rest (1) on its claim to the shoals on which the islands have

formed, (2) on the provisions of the Submerged Lands Act of May 22, 1953, 67 Stat. 29.

As to any claim of the Federal Government to the shoal areas your attention is invited to letter of August 12, 1942 from the Assistant Commissioner of the former General Land Office to the Judge Advocate General of the Navy. . . As pointed out in that letter, title to the bed of navigable waters within the boundaries of a State belong to the State under its sovereignty except where the United States had granted rights or reserved portions thereof for public purposes prior to the creation of the State, but the intention for such reservation must be definitely declared or otherwise made very plain.

*The record does not disclose that there was such definite occupation or use of these shoals by the United States for military purposes prior to the admission of the State into the Union on March 3, 1845 as would support an assertion that they did not pass to the State by virtue of sovereignty.*

*The islands are within the limits of the submerged lands of the State of Florida, as defined in the Submerged Lands Act of May 22, 1953.*

That act confirms and recognizes the title and ownership of lands beneath navigable waters within the boundaries of the several States as being in the respective State. This includes all filled in, made, or reclaimed lands which formerly were beneath navigable waters. Section 3(a) and Section 2(a)(3). *However under Section 5(a) of the act there are excepted from the operation of Section 3 "all lands filled in, built up, or otherwise reclaimed by the United States for its own use; and any rights the United States has in lands presently and actually occupied by the United States under claim of right."*

31

*From the statements in your letter it seems that the islands under discussion were built up by deposits of dredge material by operation of the Army and Navy. It is not stated whether the islands were created by the United States intentionally for its own use nor whether those islands are presently and actually occupied by the United States which is necessary to bring them under the provisions of Section 5 of the act.*

*. . . Under Section 6(a) it would seem that if the areas are needed for national defense the Government would have a valid right to control the areas, but not the proprietary right of ownership.* Under Section 6(b) a means is provided for acquiring title to the areas if needed for national defense.

*It is recognized that in the event of conflicting claims which cannot be reconciled by agreement between the United States and the State of Florida recourse must be had to the normal judicial procedure to establish the right or title to the areas in question.* That is not considered to be within the province of this Bureau. [Ex 200] (emphasis supplied)

\*\*\*

On February 26, 1954, the Chief of the Bureau of Yards and Docks requested "[*i*]*nformation on any facilities the Government may have placed on the island . . . as well as anything of record which will indicate an intention on the part of the Government to form the islands for its own use. Any information on actual use or occupancy by the Government at any time since their formation.*" [Ex 202] (emphasis supplied)

\*\*\*

32

On October 27, 1954, the Navy again presented the question of ownership of Wisteria Island to the Bureau of Land Management and requested proof establishing the Navy's rights in order to defeat an adverse claim in any potential litigation. [Ex J-68; J-69]

\*\*\*

In August 1955, as part of its 1957 Public Works Project, the Navy inquired about the acquisition of Wisteria Island to relocate fuel storage:

> 2. Included in the proposed subject project is an item for acquisition of 39 acres of land on the west side of the main chip channel, upon which a spoil bank was created using Navy funds, by dredging in 1942. It lies within an area set aside for the use of the Navy by Executive Order 4060 of 11 March 1924. However, private owners have since acquired from the State of Florida a 39-acre tract of Bay Bottom land (so called) which includes the island. There are no improvements of any description in the area and it is not in use for any purpose. [Ex 206]

It was requested that action be initiated to determine the legal status involved and secure preliminary appraisals if it was determined that the land was privately owned. [Ex 206]

\*\*\*

In September 1955 appraisals of the 39 acres were recommended "in order that sufficient funds would be included in the 1957 Public Works Program to cover the cost of acquisition of the privately owned interests in" the 39-acres. [Ex 72].

\*\*\*

On August 16, 1956, Assistant Counsel of the Navy evaluated the Navy's claim to Wisteria under the Submerged Lands Act and determined:

33

6. *It is clear, therefore, that if the area in question was built up for Federal use, it falls within the exceptions contained in Section 1313 of the Submerged Lands Act and Title to such lands remains in the United States. As stated in paragraph 2 above, there appears to be no question that the land area involved was built up by the Navy dredging. Further, it is stated that the area is needed as a site for Fuel Depot. Therefore, it only need be determined whether the land was built up by the United States for its own use. If it can be established that this area was built up for Federal use there can be no doubt that the title to the island(s) concerned is in the United States and neither Florida, nor the individual to whom such lands were quitclaimed, has any right or title thereto.*

7. *If it cannot be established that the area was built up for Federal use, the end result will be that the Navy is left without a strong argument on which to claim the islands. . . .*

8. *It is suggested, therefore, that if it be determined that the islands were not built up for Federal use that the undertaking of a condemnation proceeding be considered.* These islands were sold for approximately $2,769.00 in 1952 and in view of the relative costs involved it might be advisable to condemn the land rather than engage in lengthy and perhaps costly and unfruitful litigation. It must be recognized that if this area cannot be shown to have been built up for Federal use Navy will have no valid claim to title and the undertaking of a condemnation proceeding will be the proper course, subject, of course, to all the necessary elements and determinations prior to such a proceeding. [Ex J-73] (emphasis supplied)

*** 

34

On August 31, 1956, the Chief of the Bureau of Yards and Docks wrote to the Chief of Naval Operations regarding the status of Wisteria Island:

> 3. *It would appear that under provision (1) above the Navy would have a difficult time in proving that this island was built up for Federal use, inasmuch as the records indicate that the only reason for the establishment of the island in 1943 was a site for the deposit of spoil. It appears, therefore, that it will be necessary to acquire this island by condemnation proceedings*. [J-74] (emphasis supplied)

*** 

On September 26, 1956, the Chief of Naval Operations recommended that the Bureau of Yards and Docks continue to research the legal status of ownership of the island. [Ex 213]

***

On December 14, 1956, the Commanding Officer, U.S. Naval Station, Key West, responded to the request for records relating to Wisteria Island:

> Subj:    U.S. Naval Station, Key West, Florida; information concerning island formed by dredge deposit in vicinity of [Key West]
>
> 1. References (a) and (b) requested information concerning an island formed by dredge deposit in 1943.
>
> 2. *The subject land was deposited as spoil incidental to the deepening of the ship channel. There is nothing on record locally to indicate whether or not it was the intention of the Navy to use the island after it was created*.
>
> 3. *Before the submission of Shore Station Development Board Project ... in November 1952, there was no indication that a specific use of the*

*island was contemplated*. [Ex J-76; J-77] (emphasis
supplied)

The failure to consider and address these undisputed facts undermines the

reliability of the Findings of Fact and Conclusions of Law.

## IV.   THE CONCLUSIONS OF LAW WERE NOT SUPPORTED BY THE EVIDENCE

The district court's Conclusions of Law are not supported by the evidence.

13.   This Court holds that the greater weight of the evidence establishes that the United States filled in the Subject Property for its own use; therefore, the Subject Property did not pass from Federal ownership by operation of the SLA.

14.   First, the United States repeatedly used the Subject Property in the 1920s and 1940s as a place to store spoil intentionally and deliberately given its utilitarian location: spoil was not merely discarded on the Subject Property.

The Army Corps of Engineer witnesses both testified that spoil placed on the

subject property in the 1920s and 1940s was due to its proximity to the dredging

location; "we usually did the cheapest option for disposal." Doc 149, p. 182:20-21.

In fact, "it was regular practice for the Army Corps to use the same location that it

identifies for repeated placement of spoil." *Id*. at 187-188. Hailey even noted his

research found its "just common practice to reuse spoil areas for spoil deposition . .

. it makes simple sense to deposit the spoil in the same place that you deposited it

before."  Doc 149, p.  121:15 – 122:9.

36

Moreover, the Army Corps of Engineers pre and post surveys counter the court's conclusions. The 1940s pre-dredge survey indicated that dredge spoils could be accumulated anywhere within the much larger area of Spoil Area B. In 1943, the post-dredge survey identified several spoil locations for future "Maintenance Dredging" sites; Wisteria Island was not one of them. Ex J-40; 34-38.

\*\*\*

16.   Second, the Subject Property was deliberately filled in to be used as a protective feature protecting naval operations from natural and manmade incursions.

17.   The Subject Property was, and remains, valuable to the Navy because of its proximity to naval operations and its usefulness as a barrier against hurricane and tidal threats to the naval operations and against possible private development of the area.

18.   Third, not only was the Subject Property used to store spoil repeatedly and as a protective feature, but the Subject Property was also filled in because of its strategic location.

These conclusions are flawed because they conflate Frankford Bank and the Subject Property and Key West naval base and the Subject Property; the documents relied upon do not support the conclusion of "intent at time of creation."

20.   Fourth, the Navy had additional plans to develop the Subject Property and place physical structures on the property.

21.   When the Subject Property was filled in the 1920s, the Navy had plans to use the Subject Property for

37

wharfage and as a magazine (i.e., a place to store ammunitions).

22. At various time, the Navy also had plans to use the Subject Property as a Navy depot, a coal shed, an aviation site, dry-dock, fuel storage, and other military purposes.

Post creation uses do not meet the standard of "intent at time of creation" nor do the notions of "non-use" and speculative benefits of the presence of the Subject Property meet the statutory standard articulated by this Court.

## <u>CONCLUSION</u>

The district court misapplied the law by making factual findings not supported by evidence (or non evidence) of intent at time of creation of the Subject Property. The decision below should be reversed and this Court should quiet title in favor of F.E.B.

Respectfully submitted,

*/s/ Bruce S. Rogow*

TARA A. CAMPION
FL. Bar No.: 90944
**BRUCE S. ROGOW, P.A.**
1199 S. Federal Hwy., #212
Boca Raton, FL 33432
PH: 954.767.8909
tcampion@rogowlaw.com

BRUCE S. ROGOW
FL. Bar No.: 067999
**BRUCE S. ROGOW, P.A.**
P.O. Box 749
Cedar Mountain, NC 28718
PH: 954.767.8909
brogow@rogowlaw.com

38

## **CERTIFICATE OF COMPLIANCE**

I HEREBY CERTIFY that this Initial Brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B)(i) and contains <u>9,150</u> words.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 3, 2025, I electronically filed the foregoing Initial Brief with the Clerk of Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Bruce S. Rogow*