IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NO. **24-12383-CC**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

- versus -

F.E.B. CORPORATION,

Defendant-Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

_____

<u>BRIEF FOR APPELLEE UNITED STATES OF AMERICA</u>


United States Attorney
Attorney for Appellee
99 N.E. 4th Street
Miami, Florida 33132-2111
(305) 961-9130

Daniel Matzkin
Chief, Appellate Division

Brittany Bull Panuccio
Assistant United States Attorney

Anthony Erickson-Pogorzelski
Assistant United States Attorney

## F.E.B. Corp. v. United States, Case No. 24-12383-CC
## Certificate of Interested Persons

Undersigned counsel for the United States of America (United States) hereby certifies that the following is a complete list of persons and entities who have an interest in the outcome of this case who were not included in the Certificate of Interested Persons set forth in Defendant-Appellant's brief:

Becerra, Hon. Jacqueline

Campion, Tara A.

**Davis, Michael S.**

Erickson-Pogorzelski, Anthony

Fajardo Orshan, Ariana

F.E.B. Corporation

Gonzalez, Juan Antonio

King, Hon. James Lawrence

Lapointe, Markenzy

Martinez, Hon. Jose E.

Matzkin, Daniel

**O'Byrne, Hayden P.**

Otazo-Reyes, Hon. Alicia M

**Panuccio, Brittany Bull**

**F.E.B. Corp. v. United States, Case No. 24-12383-CC**

**Certificate of Interested Persons (Continued)**

Rogow, Bruce Stephen

Simonton, Hon. Andrea M.

*s/Anthony Erickson-Pogorzelski*
Anthony Erickson-Pogorzelski
Assistant United States Attorney

## Statement Regarding Oral Argument

The United States of America respectfully suggests that the facts and legal arguments are adequately presented in the briefs and record before this Court and that the decisional process would not be significantly aided by oral argument.

# Table of Contents

**Page**:

Certificate of Interested Persons  .........................................................c-1

Statement Regarding Oral Argument  ...................................................i

Table of Contents  .............................................................................ii

Table of Citations  ............................................................................vi

Statement of Jurisdiction  .................................................................ix

Statement of the Issues............................................................... 1

Statement of the Case:

    Introduction .......................................................................... 2

    1.    Course of Proceedings and Disposition in the Court Below  ........... 3

    2.    Statement of the Facts  ......................................................... 7

        a.    The United States Acquires the Subject Property and Reserves It for Military Purposes............................................................ 7

        b.    The United States Expresses Its Intent to Fill in and Continue to Use the Subject Property...................................................... 8

        c.    The United States Fills in the Subject Property for the Navy's Use in the Early 1920s .......................................................... 10

        d.    Florida Attempts to Sell the Island Created on the Subject Property; the Navy Objects to the Sale; Florida Withdraws the Sale; and in Response, the President Executes a New Executive Order Reserving the Subject Property for the Navy's Use.... 12

**Table of Contents**

**(continued)**

**Page:**

      e.     The United States Intentionally Fills in the Subject Property

            Again for the Navy's Use in the Early 1940s ........................ 15

      f.     Florida Issues a Quitclaim Deed for the Subject Property Over

            the Objection of the United States ......................................... 17

      g.    The United States Continues to Assert the Usefulness of the

            Subject Property and Had Plans to Use the Subject Property

            Again for Spoil Storage ......................................................... 18

   3.    Standard of Review ....................................................................... 19

Summary of the Argument ................................................................... 21

Argument:

   I.    The District Court's Findings of Fact are More Than Plausible

     in Light of the Record Viewed in Its Entirety ................................. 22

     A.    The United States Filled in the Subject Property for

         Utility ................................................................................... 23

     B.    The United States Filled in the Subject Property for

         Protection ............................................................................. 28

     C.    The United States Filled in the Subject Property for

         Strategy ................................................................................ 32

# Table of Contents

## (continued)

**Page:**

II.    The District Court's Factual Findings Establish That the United States Filled in the Subject Property for Its Own Use Under the SLA and This Court's Decision in *FEB II*.............. 34

III.    FEB's Arguments That the District Court Findings of Fact Are Clearly Erroneous Are Unavailing................................................. 37

   A.    The Clear Error Standard Applies to the District Court's Findings of Fact ...................................................... 37

   B.    The District Court Did Not Commit Clear Error.................. 38

   C.    FEB's If/Why Questions Do Not Undermine the District Court's Findings of Fact ......................................... 40

   D.    Future and Additional Uses of the Subject Property Are Circumstantial Evidence Supporting the District Court's Findings of Fact ................................................. 44

   E.    The District Court Did Not Disregard Relevant Evidence .... 44

   1.    TIIF Minutes Are Not Relevant in Determining the United States' State of Mind.............................................. 45

   2.    There Is No "Dispositive Information" Evidencing a Lack Of Intended Use on the Part of the United States.................. 45

iv

**Table of Contents**

**(continued)**

**Page:**

3.      The Navy Never Made a Statement Disdaining the Use of the
        Subject Property ..................................................................... 46

4.      There Is No Evidence that the United States Passed on an
        Opportunity to Acquire a Deed to the Subject Property ........ 47

5.      The United States Never Made a Finding That There Was
        No Intended Use of the Subject Property When It Was
        Filled in. ................................................................................. 48

F.      The Reservations of the Subject Property for Military Use
        Are Evidence of the Use of the Subject Property Not
        Evidence of an Express Retention of the Subject Property ... 50

Conclusion   .......................................................................................... 51

Certificate of Compliance ..................................................................... 52

Certificate of Service  ........................................................................... 52

## Table of Citations

**Cases:**                                                                            **Page:**

*Anderson v. City of Bessemer City, N.C.*,

   470 U.S. 564, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985)............... 6, 19, 20, 22, 39

*Chanel, Inc. v. Italian Activewear of Fla., Inc.*,

   931 F.2d 1472 (11th Cir. 1991)..............................................................................19

*F.E.B. Corp. v. United States*,

   Case No. 12-cv-10072-JEM, 2015 WL 3653162 (S.D. Fla. Mar. 25, 2015) .........3

*F.E.B. Corp. v. United States*,

   818 F.3d 681 (11th Cir. 2016).................................................................... 3, 17, 42

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*,

   456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)........................................20

*Lipscomb v. United States*,

   906 F.2d 545 (11th Cir. 1990).................................................................... 43, 45

*Madison v. Comm'r, Alabama Dep't of Corr.*,

   761 F.3d 1240 (11th Cir. 2014).................................................................. 19, 20

*Pullman-Standard v. Swint*,

   456 U.S. 273, 102 S. Ct. 1781, 72 L. Ed. 2d 66 (1982)................................ 19, 37

*Thompson v. Nagle*,

   118 F.3d 1442 (11th Cir.1997)...............................................................................20

**Table of Citations**

**(Continued)**

**Cases**:                                                                                          **Page**:

*U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt., LLC v. Vill. at Lakeridge, LLC*,

    583 U.S. 387, 138 S. Ct. 960, 200 L. Ed. 2d 218 (2018)............................... 37, 38

*United States v. California*,

    332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947)........................................ 42, 43

*United States v. F.E.B. Corp.*,

    52 F.4th 916 (11th Cir. 2022) ........................................... 1, 3, 4, 5, 6, 7, 9, 10, 12,

    .................................................... 14, 15, 17, 18, 19, 22, 33, 34, 35, 36, 38, 39, 42

*United States v. F.E.B. Corp.*,

    477 F. Supp. 3d 1277 (S.D. Fla. 2020) ....................................................................4

*United States v. United States Gypsum Co.*,

    333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)................................................20

*United States v. Yellow Cab Co.*,

    338 U.S. 338, 70 S.Ct. 177, 94 L.Ed. 150 (1949)................................................20

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,

    395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)..........................................20

**<u>Statutes & Other Authorities</u>:**                                   **<u>Page</u>:**

28 U.S.C. § 1291 ................................................................. ix

28 U.S.C. § 1345 ................................................................. ix

28 U.S.C. § 2201 ................................................................. ix

28 U.S.C. § 2409a ................................................................3

43 U.S.C. § 1301 ..................................................................1

43 U.S.C. § 1313 .............................................................5, 6

U.S. CONST. art. IV, § 3, cl. 2 ............................................42

Fed. R. App. P. 4 ................................................................ ix

Fed. R. App. P. 32 ..............................................................52

Fed. R. Civ. P. 52 ..............................................................19

### Statement of Jurisdiction

This is an appeal of a final decision of the United States District Court for the Southern District of Florida in a civil case.   The district court had jurisdiction under 28 U.S.C. § 1345 to adjudicate the United States' claim under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*.   The district court entered a Final Judgment in favor of the United States on May 30, 2024.   (DE156).[1]   Defendant, F.E.B. Corp. (FEB), filed a timely notice of appeal on July 23, 2024.   (DE159); *see* Fed. R. App. P. 4(a).   This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] Citations to the docket below use the form (DE#:#), such that (DE1:2-4) refers to docket entry 1 at pages 2 through 4.

## Statement of the Issues

This is the third appeal involving the title to Wisteria Island, 39 acres of land off the coast of Key West, Florida, which the parties refer to as the "Subject Property." (DE109:2-3); (DE155:2¶2). In the prior appeal, this Court remanded to the district court to resolve whether, as a factual matter, the United States filled in the Subject Property "for its own use," such that the Subject Property was not transferred to Florida by operation of the Submerged Lands Act, 43 U.S.C. § 1301 *et seq.* (SLA), and title to Subject Property remained with the United States. *United States v. F.E.B. Corp.*, 52 F.4th 916, 920, 931, 933 (11th Cir. 2022) (*FEB II*). Upon remand, the district court held a bench trial, made specific findings of fact as to the United States' intent at the time it filled in the Subject Property, held that the United States filled in the Subject Property for its own use, and resolved the title dispute in favor of the United States. The issues presented are:

1.      Whether the district court's factual findings that the United States filled in the Subject Property for the following intended uses are plausible in light of the record viewed in its entirety: (1) for "utility" as "a useful location for the recurrent placement of spoil;" (DE155:21¶128); (2) for "protection," even without physical improvement or other use (i.e., "non-use"), as a barrier island providing protection "from both natural and manmade incursions;" (DE155:22¶¶129, 131); and for

"strateg[y]," because the proximity to naval operations made it the ideal site "for future development in furtherance of those operations;" (DE155:22¶¶131-32).

2.    Whether, given those factual findings, the United States filled in the Subject Property for its own use prior to the passage of the SLA such that the Subject Property was excepted from the SLA, the United States retained paramount rights to the Subject Property after the passage of the SLA, and the United States holds superior title to the Subject Property over FEB.

## Statement of the Case

### Introduction

> This is not a case where the United States randomly disposed of spoil. Nor is it a case where spoil was intentionally placed in a random area that was otherwise not being used. Rather, this is a case where the United States intentionally placed spoil on a location that had strategic value to the Navy and that the United States reserved for the Navy's use.

(DE155:25¶19).[2]

As early as 1845, and repeatedly thereafter, the United States reserved the Subject Property for naval use; and on two separate occasions, the United States intentionally placed spoil on the Subject Property for its own uses of utility, protection, and strategy.   Utility: the Subject Property is immediately adjacent to the shipping channel and the harbor, and it had a shallow base making it the ideal

---

[2] Spoil is material that has been dredged and removed from the seabed and deposited after dredging.   (DE149:26 lns.2-4).

location for repeated use as a spoil location. Protection: the Subject Property is adjacent to naval operations, and the spoil island the United States created serves as a protective barrier from natural and manmade incursions. Strategy: the Subject Property is located on the southern end of Frankford Bank, which is important to the Navy's outer defense works, and it was filled in with the intention to develop it further in the future.

The district court correctly held that "the greater weight of the evidence establishes that the United States filled in the Subject Property for its own use; therefore, the Subject Property did not pass from Federal ownership by operation of the SLA." (DE155:24¶13).

## 1.    <u>Course of Proceedings and Disposition in the Court Below</u>

This is the second case brought to resolve the title dispute and third appeal. In 2012, FEB filed the original lawsuit against the United States under the Quiet Title Act, 28 U.S.C. § 2409a (QTA). *F.E.B. Corp. v. United States*, Case No. 12-cv-10072-JEM, 2015 WL 3653162 (S.D. Fla. Mar. 25, 2015). The district court held the original lawsuit was barred by the QTA's 12-year statute of limitations and dismissed it for lack of subject matter jurisdiction. *Id*. This Court affirmed. *F.E.B. Corp. v. United States*, 818 F.3d 681 (11th Cir. 2016) (*FEB I*). The title dispute thus remained unresolved. *FEB II*, 52 F.4th at 924 (citing *FEB I*, 818 F.3d at 694).

3

In 2018, the United States filed this lawsuit to resolve the ongoing title dispute. (DE1). After the parties filed cross motions for summary judgment, (DE35) and (DE38), the district court entered summary judgment for the United States, (DE67). *United States v. F.E.B. Corp.*, 477 F. Supp. 3d 1277 (S.D. Fla. 2020). FEB appealed.

On appeal, this Court affirmed in part and vacated and remanded in part. *FEB II*, 52 F.4th at 933. As relevant here, *FEB II* vacated and remanded the district court's order granting summary judgment for the United States on the title dispute. In so doing, *FEB II* interpreted and defined the SLA's for its own use exception,[3] establishing the controlling statutory standard in this case. *Id*. at 926-27.

---

[3] The relevant exception to the SLA states in full:

> There is excepted from the operation of section 1311 of this title—
> (a) all tracts or parcels of land together with all accretions thereto, resources therein, or improvements thereon, title to which has been lawfully and expressly acquired by the United States from any State or from any person in whom title had vested under the law of the State or of the United States, and all lands which the United States lawfully holds under the law of the State; all lands expressly retained by or ceded to the United States when the State entered the Union (otherwise than by a general retention or cession of lands underlying the marginal sea); all lands acquired by the United States by eminent domain proceedings, purchase, cession, gift, or otherwise in a proprietary capacity; *all lands filled in, built up, or otherwise reclaimed by the United States for its own use*; and any rights the United States has in lands presently and

*FEB II* began by interpreting the relevant statutory text.

> We begin with the word "for." "For" in this context requires intent…. The contemporaneous dictionaries … establish that land is filled in "for" the United States's use when the land is filled in "with the purpose or object" that the United States will use it—in other words, not accidentally.
>
> The other key word is "use." "Use," in the 1950s, had a broad definition…. "Use" then, can really mean any utility, any way in which the filled in land is "convert[ed]" to the United States's "service."

*Id*.

Applying these definitions, *FEB II* set forth the following controlling statutory standard to determine whether the United States filled in land for its own use so that the SLA for its own use exception applies:

> First, because of the presence of the word "for," the filling in or building up must have some intentionality to it—it cannot be accidental. The United States does not "build up" an island *for* its own use accidentally. Second, "use" is a broad term—converting to service or employing (again, *for* a purpose). And third, we note that the Act does not require *actual* use. That is, the text does not demand that the use be employed. As long as the land was created to be used, it doesn't matter whether the United States actually used the land.
>
> The question, then, is whether the United States had an intended use for Wisteria Island when the United States created it.

---

> actually occupied by the United States under claim of right….

43 U.S.C. § 1313(a) (emphasis added).

*Id*. at 927 (cleaned up and emphasis in original).

In addition, *FEB II* held that "a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial." *Id*. *FEB II* reversed and remanded summary judgment because a material question of fact remained as to the factual finding of the United States' state of mind, or intent, when it filled in the Subject Property. *Id*. at 931.

In January 2024, the district court held a bench trial. After trial, the district court entered its Findings of Fact and Conclusions of Law (DE155)[4] and Final Judgment (DE156). The district court's findings of fact are summarized in the Statement of Facts, and the district court's conclusions of law are analyzed in the Argument.

---

[4] In footnote three of the Opening Brief, FEB argues that the district court adopted the United States' proposed findings of fact, and the Eleventh Circuit has disapproved of this practice. Opening Brief at 16 n.3. Not so. While there is caselaw disapproving of the practice of "ghostwriting," where the district court asks the prevailing party to prepare findings of fact without notice to, or opportunity to respond by, the opposing party, there is no law disapproving of a district court adopting proposed findings of fact where both parties are given an opportunity to file the same and are given notice of the filing. There was no ghostwriting in this case: FEB had ample opportunity to refute any proposed findings of fact before they were adopted. (DE110); (DE112); (DE152); (DE154). Moreover, the Supreme Court has made clear that "even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 572, 105 S. Ct. 1504, 1511, 84 L. Ed. 2d 518 (1985).

2.    **Statement of the Facts**

a.    **The United States Acquires the Subject Property and Reserves It for Military Purposes.**

The United States acquired the Subject Property, and all the land that would become known as Florida, from Spain in the 1818 Adams-Onis Treaty. (DE155:3¶4); (DE109:3); (DE142-1); *FEB II*, 52 F.4th at 920.   "The Subject Property is located at the southern end of Frankford Bank, which is referred to as both 'Frankford Bank' and 'Frankfort Bank' in historic records."  (DE155:3¶3); (DE149:89 lns.21-25, 90 lns.1-12, 137 lns.4-5, 144 lns.20-24, 145 ln.25, 146 lns.1-2).   "[I]n 1845, Florida officially became a state," and that same year, "President Polk reserved the 'shoals' of Key West for 'military purposes.'"   *FEB II*, 52 F.4th at 920; (DE155:3¶¶6-8); (DE142-2); (DE149:33 lns.5-25, 34 lns.1-12).[5] The Subject Property was a shoal before being filled in and was included in the area reserved for military purposes.   (DE155:3¶7); (DE142-2); (DE142-6); (DE149:36 lns.3-14, 144 lns.20-24, 145 lns.19-25, 146 lns.1-12).

By correspondence dated April 14, 1908, Navy Commandant William H. Beehler made clear that the Navy had a "definite claim" to Frankford Bank, including the Subject Property, and that Frankford Bank was important to naval operations as it formed a natural barrier protecting Man-of-War Harbor and Fleming

---

[5] "Shoals are shallows that constitute offshore hazards to navigation."   (DE141-21); (DE149:130 lns.24-25, 131 lns.1-23).

Key.  (DE155:4¶¶12-14); (DE142-6); (DE149:35 lns.19-25, 36 lns.1-2, 37 lns.7-18).  In addition, the correspondence establishes that "the Department had contemplated erecting a coal shed on Frankford Bank, for the Navy." (DE155:4¶15); (DE142-6:3); (DE149:37 lns.19-25, 38 ln.1).

### b.    The United States Expresses Its Intent to Fill in and Continue to Use the Subject Property.

> A letter from Commander Warren Terhune, Beehler's successor at Naval Station Key West, dated October 9, 1916, … explains "[t]he advantages of Key West arise from its strategic location at the southern most continental limits to the Nation ... the ownership by the United States (Navy Department) of an existing plant, with Fleming [Key], Frankford Bank, and other partially submerged [keys] and shoals capable of development; and the existence of fortifications which should be improved."

(DE155:5¶16); (DE141-18:8); (DE149:39 lns.8-25, 40 lns.1-18).  "To that end, Commandant Terhune submitted a '[p]lan of station as of July 1, 1916,' which included '[b]lue prints [that] show possibilities at Fleming [Key], Frankford Bank, etc.'"  (DE155:5¶17);  (DE141-18:8);  (DE149:40 lns.22-25, 41 lns.1-6).  "Commandant Terhune added: 'The erection of a breakwater to afford a harbor of refuge at the naval station would be justified and would be a wise expenditure in insuring against hurricanes, at the same time affording wharfage for many small vessels.'"  (DE155:5¶18); (DE141-18:9); (DE149:41 lns.7-18).  "With regard to the reclaiming of land by filling, for the purpose of erecting a magazine on Frankford Bank … the commandant is most strongly convinced that these

acquisitions, fronting on deep water, will be worth the money." (DE155:5¶19); (DE141-18:9); (DE149:41 lns.20-25, 42 lns.1-3). Finally, the 1916 correspondence establishes that the Navy believed that Frankford Bank "should be enlarged by fill and utilized." (DE155:5¶20); (DE141-18:12); (DE149:42 lns.5-20).

A 1917 correspondence from J.M. Helm, Rear Admiral of the United States Navy, "establishes that the Navy used Frankford Bank, and more specifically the Subject Property, as a natural breakwater or protective feature." (DE155:6¶23); (DE141-18:3); (DE149:43 lns.3-17). In addition, in 1917 the Navy also had plans to develop the Subject Property for "secure and safe wharfage … and other naval expansions." (DE155:6¶¶24-26); (DE141-2); (DE149:45-47).

"Coast and Geodetic Survey (C&GS) charts of the area (Chart No. 584) from 1919 and 1923 establish that the Subject Property had water depths of 3 to 12 feet at that time." (DE155:7¶30); (DE142-13); (DE142-17); (DE149:143 lns.6-24). [6] "[D]uring a hurricane in 1919, a 150-foot ship called the Wisteria sank near the shallow ocean floor [or shoal] upon which Wisteria Island was later built. In recognition of that event, the island that the United States created in that area was called Wisteria Island." *FEB II*, 52 F.4th at 920; (DE155:7¶31). "The Wisteria

---

[6] C&GS is the federal entity that was responsible for nautical charts prior to the creation of the National Oceanic and Atmospheric Administration (NOAA), which is currently responsible for charting (DE149:52 lns.6-9, p.129 lns.14-22).

ran aground on the Subject Property due to a navigational hazard or shoal." (DE155:7¶32); (DE150:56 lns.20-25, 57 lns.1-9).

### c. The United States Fills in the Subject Property for the Navy's Use in the Early 1920s.

"[I]n the early 1920s, the United States 'dredged'—or removed soil from the ocean floor—in Key West Harbor, piling the dredged oceanic soil (also called 'spoils' or 'spoilage') up until it became an island." *FEB II*, 52 F.4th at 920; (DE155:7¶33). "Army Corps of Engineers conducted the dredge and fill project" for the benefit of the Navy. (DE155:8¶¶34-37); (DE142-18); (DE149:50 lns.2-23, 51 lns.3-13, 184 lns.21-25, 185 lns.3-9). "In 1923, during the Key West dredge project, spoil was placed on the Subject Property." (DE155:8¶38); (DE149:91 lns.4-15). "Spoil was deliberately placed on the Subject Property, given the utilitarian, protective, and strategic location of the Subject Property on the shoals of Frankford Bank." (DE155:8¶40); (DE149:91 lns.16-25, 92 lns.1-19).

"On April 25, 1924, the Department of Commerce Lighthouse Service sent C&GS a letter notifying C&GS of the appearance of the 'spoil bank' on the Subject Property." (DE155:9¶42); (DE142-21); (DE149:51 lns.20-25, 52 lns.1-9, 147 lns.17-25). "The letter includes a map with 'spoil bank' written in, pointing to the crescent-shaped island on the Subject Property." (DE155:9¶43); (DE142-21:3); (DE149:52 lns.18-25, 53 lns.1-16, 149 lns.4-14). "On the map, another note 'southerly crescent 15' high' appears to the west of the island, and 'North end 3 feet

10

high' is written above the island." (DE155:9¶44); (DE142-21:3); (DE149:149 lns.15-25, 150 lns.1-13). "The intentional placement of spoil on the Subject Property for the Navy's use in 1923 created the 'spoil bank' island, which had over 2 acres of land above the mean low water line." (DE155:9¶45); (DE142-21:3); (DE142-32); (DE149:67 lns.14-17, 100 lns.13-15); *compare* (DE142-17) *with* (DE142-35).

"A 1927 blueprint created by the U.S. Naval Station, Key West depicts a kidney shaped island on the Subject Property with an elevated southern crest…. [T]he above sea level land area was almost three acres: 'Approx. Acreage of Land above ordinary high tide: 2.95 A.'" (DE155:12¶66); (DE142-32); (DE149:65-68). "The shape of the island in the 1927 blueprint establishes that the Navy planned to continue using this island for deposit of spoil and developing it for proposed plans as a building site. Spoil islands are typically built from the outside inward. Initial deposits create an external ring and subsequent spoil deposits are placed in the center." (DE155:12¶68); (DE142-32); (DE149:93 lns.10-24). "The island depicted on the 1927 blueprint is the same island that the United States filled in for the Navy's use [and that] the Lighthouse Service identified as a 'spoil bank' in the April 23, 1924, letter." (DE155:13¶69); (DE149:65 lns.19-24).

11

> **d.     Florida Attempts to Sell the Island Created on the Subject Property; the Navy Objects to the Sale; Florida Withdraws the Sale; and in Response, the President Executes a New Executive Order Reserving the Subject Property for the Navy's Use.**

"After the [1920s] dredging was complete, two men applied to buy the island for $500." *FEB II*, 52 F.4th at 920; (DE155:9¶46).   On April 5, 1924, "[t]he Florida Trustees of Internal Improvement Fund [(TIIF)] published a notice that it intended to sell the island." *FEB II*, 52 F.4th at 920; (DE155:9¶¶47-48) (DE142-20:2); (DE149:54 lns.2-25, 55 lns.1-8).   "The island TIIF noticed for sale in 1924 is located within the Subject Property." (DE155:10¶49); (DE141-24:10 figure 8); (DE142-35); (DE149:172 lns.15-25, 173 lns.1-14).

"After Notice was published in the Key West Citizen, 'the Navy Department objected that the island belonged to the United States and therefore was not Florida's to sell.'" (DE155:10¶50 (quoting *FEB II*, 52 F.4th at 921)); (DE141-4:2); (DE142-22); (DE149:55-58).   "In response to the Navy's objection, TIIF 'withdrew the notice and rejected the application.'" (DE155:10¶52 (quoting *FEB II*, 52 F.4th at 201)); (DE141-5:2); (DE149:56 lns.5-19).

"Thereafter, and in response to Florida's attempt to sell the island on the Subject Property in 1924, the Navy took immediate action to expressly reserve the Subject Property for naval and military use." (DE155:10¶53); (DE142-23); (DE149:58 lns.19-25, 59 lns.1-6).   In a letter dated May 17, 1924, the Chief of the Bureau of Yards and Docks requested the new reservation and justified the request

12

by explaining that "the island the state of Florida proposes to sell" is part of Frankford Bank; in the Navy's "development of the harbor, Frankford Bank formed the principal protection from wave action from the westward"; and the Navy, "contemplated the enlarging of Frankford Bank by depositing the dredged material from the harbor along the edge of the bank," which constitutes the Subject Property. (DE155:10¶¶54-55); (DE142-23); (DE149:59 lns.7-25, 60 lns.1-12).

> In a letter dated May 24, 1924, from the Chief of Naval Operations to the Judge Advocate General, the Chief of Naval Operations advocates for the express reservation of "Frankford Bank and the artificial island thereon for possible naval use" because Frankford Bank forms a breakwater used by the Navy to protect nearby naval operations and future expansion of those operations.

(DE155:10-11¶56); (DE142-25); (DE149:60 lns.13-25, 61 lns.1-7).

"On August 9, 1924, Secretary [of the Navy Curtis D.] Wilbur sent President Calvin Coolidge a formal request for entry of an executive order reserving the Subject Property for Navy use."  (DE155:11¶58); (DE142-28); (DE149:61 lns.8-25).  "In this letter, the Secretary of the Navy expressly stated that '[t]he Navy Department has for over thirty years held undisputed possession of Fleming Key and the adjacent shoals including Frankford Bank ... together with all of the islands and shoals to the westward of Key West to and including the Marquesas.'" (DE155:11¶59); (DE142-28); (DE149:62 lns.1-14).  "The Secretary of the Navy also stressed that these islands and shoals should not be allowed to come under

13

private ownership because of their strategic location: 'If privately owned and developed, this location might become a constant expense on account of claims by private parties for damages incidental to gun fire.'" (DE155:11¶60); (DE142-28); (DE149:62 lns.15-21). "The Secretary further explained: 'If in the future Key West defenses are to be modernized, these areas would be of great value in connection with outer defense works.'" (DE155:11¶61); (DE142-28). "The Secretary expressly requested the reservation of the islands and shoals 'in view of their strategic location for naval purposes.'" (DE155:11¶62); (DE142-28); (DE149:62 lns.22-25, 63 lns.1-16).

"Indicative of the request's urgency, two days later on August 11, 1924, President Coolidge issued Executive Order 4060 that reiterated the reservation, for naval purposes, of [the Subject Property]." (DE155:12¶63); *FEB II*, 52 F.4th at 920-21. "Executive Order 4060 reserves 'all the islands, keys, harbors and shoals adjacent to and in the vicinity of the Island of Key West, Florida' 'for use of the Navy Department for naval purposes.'" (DE155:12¶64); (DE142-29); (DE149:63 lns.20-25, 64 lns.1-12). "The Subject Property is included in the geographic area covered by Executive Order 4060: the coverage area extends southward in a peninsula specifically to include the southern end of Frankford Bank where the Subject Property is located." (DE155:12¶65); (DE142-31); (DE149:64 lns.13-25, 65 lns.1-18).

14

> As an example of the Navy exercising control and ownership over the Subject Property after it was filled in, the United States, by and through the Secretary of the Navy, entered into a Revocable License with Lowe Fish Company on August 17, 1928, for use of the "exposed spoil bank" (i.e., the Subject Property)….

(DE155:13¶70); (DE142-34); (DE149:68 lns.14-25, 69 lns.1-8).

### e.    The United States Intentionally Fills in the Subject Property Again for the Navy's Use in the Early 1940s.

"[A]fter World War II broke out, the United States began a huge dredging contract to provide adequate seaplane landing and take-off areas, moving some 5.4 million cubic yards of spoils over two years. The project also deepened the submarine basin to twenty-two feet and the main ship channel to thirty feet." *FEB II*, 52 F.4th at 921 (internal quotations marks omitted); (DE155:13¶71); (DE142-38).   "During that period, the United States again dumped the dredge spoils where it had in the 1920s. As a result, Wisteria Island expanded to its current size, about twenty-one acres above water and eighteen below, for a total of thirty-nine acres." *FEB II*, 52 F.4th at 921; (DE155:13¶72); (DE149:91 lns.4-15, 150 lns.18-25, 151 lns.1-2); (DE142-37); (DE142-42); (DE142-43).

"In October of 1942, the Army Corps of Engineers conducted a pre-dredge survey of the Subject Property for the channel and tum basin project." (DE155:13¶73); (DE142-38); (DE149:69 lns.14-18).   "By that time, much of the other dredge work (i.e., seaplane landing and take off and submarine basin) was

15

complete and spoil locations already filled in." (DE155:13¶74); (DE142-38:1); (DE150:90 lns.14-18). "The 1943 channel and turn basin project was conducted for the Navy and with Navy funds." (DE155:14¶80); (DE142-38); (DE143-12); (DE149:77 lns.3-15).

"The 1943 channel and turn basin project had specific areas designated for spoil placement." (DE155:13¶75); (DE142-38:1, 7, 9, 12, 14); (DE149:187 lns.5-8). "The Subject Property was specifically designated as, and intentionally used as, 'spoil area B' during the 1943 channel and turn basin project." (DE155:14¶76); (DE142-38:1, 14); (DE149:186-188). "At the commencement of the 1943 channel and turn basin project, spoil area B included the spoil island created during the 1920s Key West Harbor project." (DE155:14¶77); (DE142-38:1, 14); (DE149:71 lns.7-25, 72 lns.1-4). During 1943 project "all of the Subject Property had fill placed upon it," (DE155:14¶¶82-84); (DE141-22); (DE142-41); (DE149:106 lns.6-13, 108 lns.3-13, 111 lns.17-21, 154-155, 189-190), and "at the completion of the 1943 channel and turn basin project, there were almost 25 acres of land above the mean low water line on the Subject Property." (DE155:14¶81); (DE142-41); (DE150:48 lns.13-23). In December of 1945, after the Subject Property had been filled in again for the Navy's use, the Navy exercised ownership and control over it when the Navy rejected a private party's request to use the Subject Property. (DE155:15¶86); (DE143-3); (DE149:73-74).

16

**f.      Florida Issues a Quitclaim Deed for the Subject Property Over the Objection of the United States.**

"[I]n 1951, Florida again noticed its intent to sell Wisteria Island—this time via a quitclaim deed (one with no warranties of title) to a private buyer."   *FEB II*, 52 F.4th at 923 (citing *FEB I*, 818 F.3d at 684).   Bernie Papy, who at the time was a member of the Florida House of Representatives and was acting through his agent, Paul Sawyer, was the private buyer seeking to acquire the Subject Property. (DE155:15¶¶88-89); (DE143-9); (DE149:31-32, 74-75, 81).

"On August 15, 1951, the Navy sent a 'Navy Speed Letter' to the Chief of the Bureau of Yards and Docks seeking authority to object to the TIIF's intended sale of the Subject Property."   (DE155:16¶93); (DE143-12:1); (DE149:75-77).

> In the Navy Speed Letter, the Commandant of the Sixth Naval District calls attention to the subject property's immediacy and its strategic value:
> Due to the proximity of this spoil area to highly classified Naval activities ... it is considered a dangerous security risk to allow this property to fall in the hands of private developers ... the strategic location of this spoil area makes its use for military purposes highly possible, and its use for a fuel storage area is now under consideration.

(DE155:16¶95); (DE143-12:1); (DE149:77-78).

"The United States objected to the sale, claiming that the federal government, not the state of Florida, owned Wisteria Island." *FEB II*, 52 F.4th at 923 (citing *FEB I*, 818 F.3d at 684); (DE155:16-17¶¶97-98); (DE143-13); (DE149:78-80).

17

On January 7, 1952, Florida Attorney General Richard W. Ervin sent a letter to the Florida Department of Agriculture in which Ervin stated the following: "I am unable to state definitely whether or not the Navy's claim is valid. However, I do think that the claim is debatable enough and so shrouded in antiquity that I think the best course would be for the Trustees to complete the sale and explain the Navy's claim to Mr. Papy and allow him to accept the Trustees' deed at his own risk."

(DE155:17¶99); (DE143-15); (DE149:80-81).   "TIIF decided to proceed with issuing the quitclaim deed to Sawyer, who was acting 'on behalf of Mr. Bernie Papy,' even though the Navy made a 'claim of ownership'; this is in direct contrast to how TIIF proceeded in 1924 under similar circumstances."   (DE155:17¶100); (DE141-12:2); (DE149:81-82).   "On January 9, 1952, TIIF issued a quitclaim deed for the Subject Property to FEB's predecessor in interest, Sawyer." (DE155:17¶101); (DE143-16); (DE149:82).   "Florida did not have a colorable claim to the Subject Property on January 9, 1952, when it issued the quitclaim deed." (DE155:17¶102); (DE141-17:4¶¶16-17).

> **g.   The United States Continues to Assert the Usefulness of the Subject Property and Had Plans to Use the Subject Property Again for Spoil Storage.**

"In 1954, the Navy asked the Bureau of Land Management about its claim to Wisteria Island, explaining that Wisteria Island and the area around Frankfort Bank were of great strategic importance. The Navy asserted that Wisteria Island was close to highly classified Naval activities, and it would be a security risk to allow the

island to fall into the hands of private individuals." (DE155:21¶121 (quoting *FEB II*, 52 F.4th at 923)); (DE143-21); (DE143-23); (DE149:82-83, 85-86).

> In 1966, the Army Corps conducted a dredging project at Key West Bight. For the 1966 Key West Bight project, "[m]aterials excavated during construction will be placed on the existing spoil island as show on plate 2. It is proposed to utilize this spoil island both for initial construction and subsequent maintenances." Plate 2 clearly identifies the southern portion of Wisteria Island as the proposed "spoil area" to be used in 1966 and for subsequent maintenances.

(DE155:21¶¶122-124); (DE143-34); (DE149:87-89, 190-191).

## 3.    Standard of Review

While conclusions of law are reviewed *de novo*, findings of fact are reviewed for clear error. Fed. R. Civ. P. 52(a); *Madison v. Comm'r, Alabama Dep't of Corr.*, 761 F.3d 1240, 1245 (11th Cir. 2014). "[A] party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial." *FEB II*, 52 F.4th at 927 (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991)). *See also Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511, 84 L. Ed. 2d 518 (1985) ("a finding of intentional discrimination is a finding of fact"); *Pullman-Standard v. Swint*, 456 U.S. 273, 289, 102 S. Ct. 1781, 1790, 72 L. Ed. 2d 66 (1982) ("intent is a finding of fact to be made by the trial court").

"Findings of fact shall not be set aside unless clearly erroneous."  *Anderson*,

470 U.S. at 573.

> "[A] finding is 'clearly erroneous' when although there is
> evidence to support it, the reviewing court on the entire
> evidence is left with the definite and firm conviction that a
> mistake has been committed."  *United States v. United*
> *States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542,
> 92 L.Ed. 746 (1948).  This standard plainly does not
> entitle a reviewing court to reverse the finding of the trier
> of fact simply because it is convinced that it would have
> decided the case differently…. "In applying the clearly
> erroneous standard to the findings of a district court sitting
> without a jury, appellate courts must constantly have in
> mind that their function is not to decide factual issues *de*
> *novo*."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*,
> 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129
> (1969). *If the district court's account of the evidence is*
> *plausible in light of the record viewed in its entirety, the*
> *court of appeals may not reverse it* even though convinced
> that had it been sitting as the trier of fact, it would have
> weighed the evidence differently. Where there are two
> permissible views of the evidence, the factfinder's choice
> between them cannot be clearly erroneous.   *United States*
> *v. Yellow Cab Co.*, 338 U.S. 338, 342, 70 S.Ct. 177, 179,
> 94 L.Ed. 150 (1949); *see also Inwood Laboratories, Inc. v.*
> *Ives Laboratories, Inc.*, 456 U.S. 844, 102 S.Ct. 2182, 72
> L.Ed.2d 606 (1982).

*Id*. at 573-74 (emphasis added).   "This is so even when the district court's findings

do not rest on credibility determinations, but are based instead on physical or

documentary evidence or inferences from other facts."  *Id*. at 574; *Madison*, 761

F.3d at 1247 (11th Cir. 2014) (quoting *Thompson v. Nagle*, 118 F.3d 1442, 1447

(11th Cir.1997)) ("Findings of fact are reviewed for clear error 'even when the

20

district court's findings are drawn solely from documents, records, or inferences from other facts.'").

## Summary of the Argument

The district court's finding of intent in this case is well supported by the evidence presented at trial and is, therefore, more than plausible in light of the record viewed in its entirety. The district court found, and the evidence in the record establishes, that when the United States placed spoil on the Subject Property in the 1920s and again in the 1940s it did so with the intent to use the Subject Property for utility, protection, and strategy. The Subject Property was used for utility because it was a functional location for the repeated storage of spoil. The Subject Property was used for protection because it created a natural barrier that protected the adjacent naval operations from natural and manmade incursions. And the Subject Property was used for strategy because its proximity to naval operations made it the ideal location for future development.

*FEB II* establishes the controlling statutory standard for determining whether a property has been filled in for the United States' own use so that the property is excepted from the SLA. The district court's factual findings that the United States filled in the Subject Property with the intent to use it for utility, protection, and strategy satisfies the statutory standard established in *FEB II*. Accordingly, the United States filled in the Subject Property for its own use as that term is used in the

SLA and defined by *FEB II*.   The Subject Property is excepted from the SLA, and the United States retains title to it.

While FEB makes several arguments challenging the district court's factual findings, none of these establish that the district court committed clear error.   FEB's arguments to the contrary are all premised upon a misapplication of the standard of review, irrelevant if/why questions, and misconstrued factual assertions.   FEB's arguments fail.

### Argument

### I.   The District Court's Findings of Fact are More Than Plausible in Light of the Record Viewed in Its Entirety.

*FEB II* remanded this matter to the district court for a bench trial to "determine the United States's intent in creating Wisteria Island."   *FEB II*, 52 F.4th at 927.   "[T]he [district] [c]ourt resolve[d] the dispute of fact identified in *FEB II*—'whether the United States created Wisteria Island for its own use or whether Wisteria Island's creation was an accident'—*FEB II*, 52 F.4th at 931—in favor of the United States."   (DE155:25¶23).   In doing so, the district court held that the United States intentionally filled in the Subject Property with the intent to use it for utility, protection, and strategy.   The district court's factual findings are more than "plausible in light of the record viewed in its entirety."   *Anderson*, 470 U.S. at 574. The district court did not commit clear error: the judgment in favor of the United States should be affirmed.

22

## A.    The United States Filled in the Subject Property for Utility.

The district court found that "[d]redge spoil was placed on the Subject Property for utility: the Subject Property is located adjacent to the shipping channel and harbor and constitutes a shoal with shallow waters, making it a useful location for the recurrent placement of spoil."    (DE155:21¶128).

The fact that the Subject Property is adjacent to the shipping channel and harbor and constitutes a shoal with shallow waters is uncontested.   It is also uncontested that the United States placed spoil on the Subject Property during two separate dredge projects: one in the 1920s and a second in the 1940s.  *See, e.g.*, Opening Brief at 16.[7]

Nonetheless, FEB argues that the evidence does not support a finding that when the United States placed spoil on the Subject Property it did so with the intent to use it again for spoil storage.  *See, e.g.*, Opening Brief at 43-44.   FEB's argument appears to be that the United States placed the spoil on the Subject Property, on two separate occasions, by accident and only to dispose of the spoil, not to use the Subject Property as a recurrent spoil storage location.

---

[7] Citations to FEB's Opening Brief use the form Opening Brief at # with the page # citation referring to the CM/ECF filed page number, not the page number included on the bottom of the Opening Brief.

FEB's argument fails. The district court's factual finding is supported by evidence in the record. The documentary evidence cited in the Statement of Facts alone warrants affirming the district court's finding.

In addition, the United States called Professor Charlie Hailey as an expert witness in this case, and the district court correctly relied on Professor Hailey's expert opinions. Professor Hailey is a tenured professor of architecture at the University of Florida with a focus on material culture and cultural landscapes. (DE149:22-23).[8] In addition to teaching specific courses on material culture and cultural landscapes, Professor Hailey has written six peer reviewed and published books on the subject. (DE149:23-25). One of those books, *Spoil Island Reading the Makeshift Archipelago*, addresses how and why spoil islands are created and includes a chapter that focuses on Wisteria Island (and its sister spoil island, Sunset Key). Charlie Hailey, *Spoil Island Reading the Makeshift Archipelago* (2013).[9] Professor Hailey researched and wrote *Spoil Island* independently; he first learned of the litigation over the title dispute now before this Court after *Spoil Island* was published. (DE149:26 lns.8-20). Professor Hailey's expert opinions are reliable

---

[8] "Material culture constitutes the objects and buildings and even written documents that are produced and used by humans," and "[c]ultural landscapes are the territories and built environments that combine natural resources with cultural resources." (DE149:23).

[9] "*Spoil Island* is about the construction and subsequent use of spoil islands. The book begins in New York and works its way down the coast, around the peninsula of Florida, and it investigates a series of case studies in order to understand the use and significance of spoil islands." (DE149:27 lns.2-6).

and credible.   The district court's Findings of Fact and Conclusions of Law, which mirror Professor Hailey's opinions, should be affirmed.

Professor Hailey opined, and the district court expressly found (DE155:21¶128), that the United States placed spoil on the Subject Property for utility.  Professor Hailey explained his conclusion that the Subject Property was filled in intentionally for the use of utility as follows:

> For utility, the location of the spoil area immediately adjacent to the shipping channel and the harbor, and also the fact that there was a shallow -- that it was shallow water and a shoal that would provide a shallow base for the deposit of spoil…. allow it to be a recurrent -- be used as a recurrent place for the deposit of spoil.

(DE149:91 lns.16-24).   Professor Hailey testified that the shape of the island created during the 1920s dredge project evidences the United States intent to create "an island for spoil deposition" with future placement of spoil then contemplated. (DE149:93 lns.10-24 (relying on DE142-32)).   The island created was a crescent shape, and as Professor Hailey explained, "spoil islands are made … from the outside in" so that "the middle would be filled in."  *Id*.  Professor Hailey also testified that throughout his research he found that once a spoil location was selected "spoil would be deposited in the same location[] over periods of time."   (DE149:87 lns.20-25).

Dr. Jennifer Coor, a supervisory geologist at the U.S. Army Corps of Engineers who testified at trial as the official representative of the Army Corps,

(DE149:182), corroborated Professor Hailey's opinion.  Dr. Coor explained that

with the passage of the National Environmental Policy Act in 1970 (NEPA), Army

Corps dredging practices changed "greatly."  (DE149:183).  Prior to 1970, the

Army Corps would use the "cheapest, easiest option for disposal" of spoil,

(DE149:184 lns.1-5), and would not always designate a specific location for the

placement of spoil.  (DE149:187 lns.9-11).  Accordingly, before 1970, the Army

Corps would often dispose of spoil at random locations that were convenient and not

specifically designated.  That is not what occurred here: the Subject Property was

specifically designated for the placement of spoil during the 1940s dredge project.

(DE149:187 lns.5-19).[10]

FEB attempts to use the evidence of the utility of the Subject Property to argue

that spoil was placed on the Subject Property by accident and only to dispose of it.

---

[10] FEB argues that the district court erred when it found that Subject Property was
specifically designated for the placement of spoil during the 1940s dredge project
because "[t]he 39-acre Subject Property occupied only a portion of the much larger
Spoil Area B."  Opening Brief at 32.  This argument is baseless.  First, FEB does
not contest, nor can it, that the Subject Property is subsumed within Spoil Area B.
Second, the Subject Property—as it is defined in this litigation—only exists because
it was filled in for a second time during the 1940s dredge project.  The Subject
Property was defined in 1952 when the State of Florida issues a quitclaim deed for
the lands within Spoil Area B that were filled in by the United States.
Similarly, FEB's argument that the district court "conflate[s] Frankford Bank and
the Subject Property" is incongruous.   It is difficult to understand how there may be
a flawed conflation between Frankford Bank and the Subject Property when the
Subject Property is not only a part of Frankford Bank, but is the part of Frankford
Bank that was intentionally filled in twice by the United States, once in the 1920s
and again in the 1940s, and marks the border of the southern peninsula of the area
covered by Executive Order 4060.

Opening Brief at 43. In support of its argument, FEB provides the following quotation, which does not exist in the record: "we usually did the cheapest option for disposal." *Id.* Not only is the quote not found at the cited location, "Doc 149, p. 182:20-21," the quoted language is not contained anywhere in the transcript. The closest quote is the one quoted above, which is found two pages later and comes up when Dr. Coor explains Army Corps practices for placement of spoil and how that practice changed since the passage of NEPA in 1970. As Dr. Coor explained, "prior to 1970, [the Army Corps] did the usually the cheapest, easiest option for disposal," which would be to dispose of the spoil anywhere along the dredging project as the project progressed and without designation. (DE149:184 lns.4-5). That is not the practice today, and it is not what happened in this case.

Contrary to FEB's implication, Opening Brief at 27, Dr. Coor never testified that the spoil placed on the Subject Property was placed there randomly or by accident and without intent. Similarly, and also contrary to FEB's assertion, Opening Brief at 12, 25-26, John Bearce never testified that spoil was discarded without an intended use. Bearce is a navigation operations manager for the Army Corps, and his role in this case was limited.[11] He was "charged with helping in research of documents regarding that general [geographic] area," (DE150:62

---

[11] Although Bearce was listed as a witness the United States may call if the need arises, (DE109:6), the United States did not call Bearce. FEB elected to call Bearce in its case-in-chief.

lns.17-20), and as he clarified, his research was limited to documents within the Army Corps' district office, (DE150:64 lns.20-21). Bearce "was not looking for documents that would explain the why" of creation, (DE150:64 lns.8-12), and as Dr. Coor explained, Army Corps documents from that era would not contain such information, (DE149:185 lns.10-23).

Furthermore, Dr. Coor explained that even before 1970, it was the Army Corps' regular practice to use the same location that it identifies for placement of spoil for recurrent use. (DE149:190 lns.5-14). That is what happened in this case. Spoil was placed on the Subject Property more than once. *Id.* Moreover, Dr. Coor testified that there is evidence that the Army Corps had plans to use the Subject Property for spoil storage again in the 1960s. (DE149:190-192 (citing DE143-34:30)). And Dr. Coor explained that she is currently working on Army Corps dredging projects in Key West in which the Subject Property is being considered as a location for the potential placement of spoil. (DE149:192-193).

Accordingly, the district court's finding that spoil was intentionally placed on the Subject Property in the 1920s and again in the 1940s for utility is more than plausible in light of the record viewed in its entirety.

## B.   The United States Filled in the Subject Property for Protection.

The district court found that "[d]redge spoil was placed on the Subject Property to augment the protection the Subject Property provided for navy

28

operations from both natural and manmade incursions," and that "[t]he United States placed spoil on the Subject Property with federal use in mind, including non-use as a protective feature." (DE155:22¶¶129, 131). The district court's finding is supported by the greater weight of the evidence.

As discussed, the record is replete with evidence that the Navy used the Subject Property as a barrier island and that it did not want the Subject Property to come into private ownership or be developed for private use given its proximity to naval operations. *See, e.g.,* (DE141-18:3, 9, 12); (DE142-23); (DE142-28); (DE143-12:1). In addition, the testimony of Professor Hailey; Captain Elizabeth Regoli, commanding officer at the Naval Air Station Key West, Florida; and two of FEB's own witnesses support the district court's finding that the Subject Property was filled in to augment its protective features.

Professor Hailey testified that, in his expert opinion, the Subject Property was filled in because of the protection it afforded the Navy. (DE149:91-94). Professor Hailey's opinion provides evidentiary support for the district court's finding. Professor Hailey explained the protective features of the Subject Property, and evidence supporting the same, as follows:

> In one way the protection that was afforded by Frankfort Bank, which was originally mentioned in Commander Beehler's letter of 1908 in which he worries about the removal of parts of Frankfort Bank and the exposure that that would cause for the harbor. And in 1916, the Navy Commission discussions about the spoil bank as a

29

> protective barrier for Man-of-War Harbor, and also the precedent of other spoil banks for breakwaters.
>
> ***
>
> And the protection was needed from private ownership because of the proximity of the spoil area, that it would pose a security risk because of its proximity to naval operations.

(DE149:92 lns.2-13).   Professor Hailey also explained his opinion that filling in the property for "non-use," i.e., as an undeveloped island, is a use in this case.   "Like not placing structures on there was also a use.   Just the use, a non-use of it providing the protection both from the natural forces from the west and northwest of wave action, and then also protecting it from private development which would be a security risk."   (DE149:94 lns.7-13).

Captain Regoli also testified about the protection the Subject Property provides Naval Air Station Key West.   Captain Regoli is the commanding officer at Naval Air Station Key West.   (DE150:3 lns.13-17).   She testified on behalf of the Navy in her official capacity.   (DE150:5 lns.14-17).   Captain Regoli testified that the Navy continues to use the subject property for protection to this very day: "It's also used for environmental protection from hazard as it shields various environmental detriments from our port facilities, as well as protecting the freedom of the shipping lanes to get in and out of all of our port facilities."   (DE150:12 lns.10-19).

Finally, the testimony of two of FEB's own witnesses, Michael Finkbeiner, a licensed land surveyor, and Ernest W. Dobson, a consultant and retired naval officer, support the district court's finding that the Subject Property was used for "non-use" as a protective feature.   Finkbeiner testified that he has worked on creating islands for wave attenuation; that spoil may be used to create wave attenuation islands; and that such manmade islands have value undeveloped, or unused, merely for the wave attenuation that they provide.   (DE150:57 lns.10-21).   Thus, Finkbeiner's testimony establishes that creating an island for the purpose of wave attenuation—or protection from natural incursion—even without any other development, improvement, or use of the island, is a use.

Moreover, Dobson admitted that the Navy employs "non-use" of land as a use.  Dobson affirmed that while he was the commanding officer at Naval Air Station Jacksonville the Navy acquired a piece of real property where the only intent in purchasing the property was that it not be used, i.e., it was acquired to prevent private development.   (DE150:92 lns.20-25, 93 ln.1).   Dobson's testimony supports a finding of naval "non-use" as use.

The district court's finding that the Subject Property was filled in to provide protection to the adjacent naval operations is more than plausible in light of the record viewed in its entirety.

## C.    The United States Filled in the Subject Property for Strategy.

The district court found that "[d]redge spoil was placed on the Subject Property given its strategic location, not only in proximity to naval operations, but for future development in furtherance of those operations," and that it was filled in intentionally "as a site for possible future physical improvements in support of military defenses."  (DE155:22¶¶130, 132).   The district court's finding should be affirmed.

As with utility, the strategic location and importance of the Subject Property to the Navy is not seriously questioned in this case.  Rather, FEB appears to be contesting whether, when spoil was placed on the Subject Property, it was done so in furtherance of the Subject Property's strategic value to the Navy.   The testimony of both Professor Hailey and Captain Regoli support the district court's finding.

In Professor Hailey's expert opinion, the United States intentionally placed spoil on the Subject Property given its strategic location.   In support of his opinion, Professor Hailey offered the following testimony: "One of the sources that I used for that is Curtis Wilbur's letter where it includes the spoil area as that area as important for outer defense works. And then subsequent references to the strategic location of the spoil area."  (DE149:92 lns.14-19).   In support of his opinion that the Subject Property was filled in as a site for future development by the Navy, Professor Hailey testified as follows:

32

> There were a series of uses that were proposed, the first of which was 1908. Commander Beehler talks about his conversations with Admiral Forsythe about a coal shed located on the subject property.
> In 1916, the proposed use of a -- for explosive stowage.
> In 1917, the secure and safe wharfage and the blueprints that we looked at.
> And then in 1951, the fuel storage that was mentioned in the 1951 letter.

(DE149:92-93).[12]    And Captain Regoli corroborated Professor Hailey's opinion when she testified that "Naval Air Station Key West desires to retain the subject property for our strategic use, both current and future."   (DE150:12 lns.10-13).

Thus, the district court's findings of fact that the subject property was filled in for utility, protection, and strategy are more than plausible in light of the record viewed and its entirety.

---

[12] While Professor Hailey offered expert opinions on the reasons why the Subject Property was filled in and the intended future uses for the Subject Property at the time it was filled in—specifically utility, protection, and strategy—Professor Hailey did not opine on whether those uses satisfy the for its own use exception to the SLA as defined by *FEB II*.  FEB appears to be confused as to why Professor Hailey failed to offer such an opinion.  Opening Brief at 24.  Professor Hailey did not opine on whether the intended uses of the Subject Property satisfy the for its own use exception because determining whether a set of facts satisfy a statutory standard is a mixed question or a legal conclusion, and "[w]hile expert witnesses may offer opinions on an ultimate issue in a case, they may not offer legal conclusions."  *FEB II*, 52 F.4th at 932.

II.    **The District Court's Factual Findings Establish That the United States Filled in the Subject Property for Its Own Use Under the SLA and This Court's Decision in *FEB II*.**

The district court's factual findings that the United States filled in the Subject Property to use it for utility, protection, and strategy establish that the United States filled in the Subject Property for its own use as that statutory term was defined by *FEB II*. *FEB II* established a three-part test to determine whether the United States filled in land for its own use. *FEB II*, 52 F.4th at 927. All three parts are satisfied in this case.

"First, because of the presence of the word 'for,' the filling in or building up must have some intentionality to it—it cannot be accidental. The United States does not 'build up' an island *for* its own use accidentally." *Id*. (emphasis in original). As explained above, intent is a fact question. The first prong is satisfied by the district court's factual finding of intent.

"Second, 'use' is a broad term—converting to service or employing (again, *for* a purpose)." *FEB II*, 52 F.4th at 927 (emphasis in original). "Use then, can really mean any utility, any way in which the filled in land is converted to the United States's service." *Id*. at 926-27 (internal quotation marks omitted). Moreover, *FEB II* expressly held that "if the United States created the island as [a] place for contemporaneous and future dredge-spoil deposits, that still would be 'for its own use.'" *Id*. at 931.

34

There can be no question that the district court's finding of utility as a use is sufficient to satisfy the SLA's for its own use exception. As explained, the evidence establishes that when the United States placed spoil on the Subject Property in the 1920s and the 1940s it did so with the intent to use the location again in the future for spoil storage. *FEB II* expressly found that such a use is "for its own use" under the SLA. *Id*.

Similarly, the district court's finding that the Subject Property was filled in with the intent to use it for protection is a use under the SLA's for its own use exception. FEB's own witnesses establish that spoil islands are used for wave attenuation, and the Navy has a practice of using land for "non-use" (i.e., to prevent private development). Professor Hailey's testimony establishes that the United States filled in the Subject Property for this use. When the United States fills in property to protect adjacent naval operations from natural and manmade incursions, as it did here, the "land is converted to the United States's service" and is being used as a protective feature. *Id*. at 927.

Finally, the district court's finding that the Subject Property was filled in to be used for strategy is a use under the SLA for its own use exception. The district court found, and the record establishes, that the Subject Property had strategic value to the Navy, the Navy had plans to develop the Subject Property in the future, and the United States filled in the Subject Property for that use. When the United States

35

fills in land given its strategic location with the intent to develop it in the future, the United States is converting the land to its service and employing it for that use.

Accordingly, the Subject Property was filled in for the United States' "use" as that term is used the SLA and defined by *FEB II*.

"[T]hird, … the Act does not require *actual* use. That is, the text does not demand that the use be employed. As long as the land was created to be used, it doesn't matter whether the United States actually used the land." *Id*. at 927 (emphasis in original). This principle is satisfied. Moreover, there is evidence that the Subject Property was used for its intended uses. Spoil was placed on the Subject Property more than once, and there is evidence that the Navy used, and continues to use, the Subject Property as a protective feature.

As *FEB II* explained, in determining whether the for its own use exception applies, "[t]he question … is whether the United States had an intended use for Wisteria Island when the United States created it." *Id*. As the district court correctly held, and the evidence shows, the answer to that question is yes: the United States intended multiple uses for the Subject Property when it filled it in. The United States filled in the Subject Property for its own use before the passage of the SLA such that the Subject Property was excepted from the SLA, the United States retained paramount rights to the Subject Property after the passage of the SLA, and the United States holds superior title to the Subject Property over FEB.

36

## III.    FEB's Arguments That the District Court Findings of Fact Are Clearly Erroneous Are Unavailing.

### A.    The Clear Error Standard Applies to the District Court's Findings of Fact.

FEB attempts to confuse the standard of review for the district court's finding of intent in this case.   In the Opening Brief, FEB asserts that "[t]his appeal presents a mixed question of historical facts and statutory law."   Opening Brief at 13.   After recognizing that *FEB II* set forth "the statutory standard to be applied" in this case, FEB argues that "[a]ll that remains is the legal issue of intent at creation, and *de novo* review by the Court is appropriate."   *Id*. at 15.   FEB's argument is confused.

Mixed questions of law and fact are "questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated."   *Pullman-Standard*, 456 U.S. at 290.   Where, as here, an appeal challenges a district court's factual finding, not whether those factual findings satisfy the statutory standard, that challenge is reviewed for clear error.   *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt., LLC v. Vill. at Lakeridge, LLC*, 583 U.S. 387, 138 S. Ct. 960, 966, 200 L. Ed. 2d 218 (2018) (clarifying that factual findings made in evaluating a statutory standard "are reviewable only for clear error").

37

In this case, FEB is challenging the district court's finding of intent.   As this Court has already held, the United States' state of mind, or intent, when it filled in the Subject Property is "a question of fact for the factfinder," not a conclusion of law or even a mixed question.   *FEB II*, 52 F.4th at 927.[13]   Accordingly, FEB's challenge to the district court's finding that the United States filled in the Subject Property with the intent to use it for utility, protection, and strategy is subject to only clear error review, not *de novo* review.[14]

### B.    The District Court Did Not Commit Clear Error.

FEB's challenge of the district court's finding of intent under the clear error standard fails.   FEB failed to introduce any evidence at trial that establishes the United States filled in the Subject Property by accident or without intent,[15] and FEB admits there is no contemporaneous, direct evidence of the United States' intent in

---

[13] The Opening Brief also includes a lengthy discussion on the meaning of intent. Opening Brief at 17-19.   Intent, however, is not a statutory term.   Rather, *FEB II* held that the SLA's for its own use exception requires a showing of intent. Accordingly, the only finding of "intent" required in this case is the intent required under *FEB II*.

[14] Even if this were a mixed question, clear error review would still apply.   As the Supreme Court clarified, "[m]ixed questions are not all alike," and "the standard of review for a mixed question all depends—on whether answering it entails primarily legal or factual work."   *Vill. at Lakeridge, LLC*, 583 U.S. at 396.   Where the issue before the court is "factual sounding" the district court's resolution of that issue is "subject only to review for clear error."   *Id.* at 968-69.

[15] While FEB identified Roberto Balbis as an expert witness it expected to call at trial, (DE109:7), and FEB relied on Balbis' expert opinions in asserting a question of fact as to the intent of the United States on appeal in *FEB II*, *FEB II*, 52 F.4th at 929, Balbis did not testify at trial as to a lack of intent on the part of the United States or otherwise.

this case, Opening Brief at 19. [16]    Rather, FEB argues that the lack of contemporaneous, direct evidence of intent, coupled with the lack of affirmative action by the United States post creation, creates enough doubt as to the intent of the United States that the district court's finding is clearly erroneous.   This argument fails.

The clearly erroneous standard does not require a showing beyond a reasonable doubt.   The clearly erroneous standard merely asks whether the district court's "account of the evidence is plausible in light of the record viewed in its entirety."   *Anderson*, 470 U.S. at 574.   As explained, the district court's findings of fact meet this standard.

Even assuming that FEB relies upon a permissible view of the evidence in attempting to create a question as to the intent of the United States (i.e., that there is more than one way to view the evidence), the district court's findings must still be affirmed.   "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."   *Id*.

---

[16] While FEB acknowledges that there is only "circumstantial evidence" in this case, FEB erroneously contends that none of the live witnesses "could … speak to the intentions of the United States in the 20s or the 40s."   Opening Brief at 19.   A witness "may offer opinion testimony if that witness's knowledge 'will help the trier of fact to understand the evidence or to determine a fact in issue."   *FEB II*, 52 F.4th at 931-32 (quoting Fed. R. Evid. 702) (internal emphasis omitted and alterations accepted).   In this case, Professor Hailey offered expert opinions on the intent of the United States at the time it placed spoil on the Subject Property.   Professor Hailey was qualified to offer his expert opinions, and those opinions helped the trier of fact determine a fact at issue: the United States' intent.

### C.    FEB's If/Why Questions Do Not Undermine the District Court's Findings of Fact.

Regardless, FEB fails to create a question as to the intent of the United States. In the Opening Brief, FEB poses a list of "common sense queries," which are nothing more than if/why questions, that FEB claims undermine the district court's factual findings.   Opening Brief at 20-22.   Once again, FEB is incorrect.

Even if the Court entertains FEB's if/why questions, those questions do not create reasonable doubt in this case (which, again, is not the standard).   In the Opening Brief, FEB asks if the United States had a use for the Subject Property why didn't it do the following.[17]

(1)    Why didn't the United States articulate that use?   On both direct and cross examination, Dr. Coor explained that on dredge projects conducted before the passage of NEPA in 1970, the Army Corps had "no reason to communicate what any future use was" for property that had spoil placed upon it.   (DE149:185 lns.10-23, 195 lns.13-23).

(2)    Why didn't the United States include the Subject Property in an undefined application to TIIF in 1941 purportedly evidenced by Exhibit 42?   The Opening Brief refers to "Ex 42" but there is no Exhibit 42 in this case.   To the extent FEB meant to refer to Exhibit 142, FEB failed to call a witness to discuss that exhibit

---

[17] For ease of reference, the commonsense answers are provided after the "common sense queries."

or explain its relevance, and the relevance is not apparent on the face of the exhibit. Exhibit 142 is a copy of TIIF minutes.   (DE145-30).   The minutes fail to offer any information as to why the application referenced was made, what the application included, and what "State owned land" was at issue.

(3)    Why didn't the United States include the Subject Property in a request purportedly evidenced by Exhibit 150?   No witness testified about Exhibit 150. Nonetheless, the exhibit itself offers some insight.   Exhibit 150 is a Navy letter dated January 10, 1942, that discusses "the acquisition of title to the spoil areas surrounding Salt Pond Key."   (DE145-38).   In Exhibit 150, the Navy explains that "the State of Florida … claims title to areas under non-navigable bodies of water covered by water three feet or less in depth" and advocates for pursuing title to the Salt Pond Key area.   *Id*.   There is no evidence that the Subject Property was in the Salt Pond Key area,[18] and there is evidence that the Subject Property, pre-fill, had depths of three feet and more, *see e.g.*, (DE142-17).

(4)    Why wasn't the Subject Property included in Exhibit J-49, a quitclaim deed issued in 1946.   Again, no witness testified about Exhibit J-49.   Exhibit J-49 is a quitclaim deed from the State of Florida to the United States dated November 27, 1946, for four "Spoil Areas."   (DE143-4).   There is no evidence as to how or why the deed was executed or the metes and bounds were decided.   Captain Regoli

---

[18] The Subject Property is separated from the Salt Pond Key area by Fleming Key.

testified that the Navy would act on a property "[o]nly when we need to," and the lack of action is not an indication of the Navy's lack of ownership or interest. (DE150:9-10).

(5)    Why did the United States fail to designate the Subject Property as a location for maintenance dredging in Exhibit J-40?   Once again, no witness testified as to this fact, and the exhibit cited to do not establish it.   The only testimony in the record on maintenance dredging spoil locations is the testimony of Professor Hailey and Dr. Coor, both of whom testified that the Subject Property was once again identified as a place for maintenance dredging spoil in 1966. (DE149:83, 190-91).

(6)    Why did the United States fail to act in 1951?   In 1951, when TIIF noticed its intent to sell the Subject Property for the second time in thirty years, the Navy took the same action it took in response to TIIF's first notice in 1924: "The United States objected to the sale, claiming that the federal government, not the state of Florida, owned Wisteria Island."   *FEB II*, 52 F.4th at 923 (citing *FEB I*, 818 F.3d at 684); (DE143-13).

(7)    Why did the United States fail to act in 1952?   The United States did not act because it did not need to.   The United States can only dispose of property by an express act of Congress.   U.S. CONST. art. IV, § 3, cl. 2.   "The Government, which holds its interests [in property] in trust for all the people, is not to be deprived

of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property." *United States v. California*, 332 U.S. 19, 40, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947).  Unlike private parties, the United States cannot abandon property or lose its claim to property through adverse possession, acquiescence, laches, or failure to act.  *See, e.g., id.* (precluding abandonment or disposition of government property by acquiescence, laches, or failure to act); *Lipscomb v. United States*, 906 F.2d 545, 546 n.2 (11th Cir. 1990) ("Public property cannot be acquired by means of adverse possession.").

(8)    Why did the United States fail to act in 1953 – 1954?  See response to query 7 above.  Moreover, contrary to FEB's assertion Exhibit J-74 does not conclude that the United States does not own the Subject Property or that it did not fill in the Subject Property up for its own use; rather, it merely states "the Navy would have a difficult time in proving that this island was built up for Federal use, inasmuch as the records indicate that the only reason for the establishment of the island in 1943 was a site for the deposit of spoil."  (DE143-29:2).

(9)    Why didn't the United States acquire the Subject Property rather than Sunset Key?  Once again, there was no testimony at trial on this fact.  Moreover, there is record evidence that the Subject Property was originally identified as the site for the fuel storage tanks that Sunset Key (a/k/a Tank Island) was eventually used

43

for, (DE141-13), and that Papy, who had an interest in steering the Navy away from the Subject Property, was involved in the transaction, (DE147-7).

(10)   Why didn't the United States act before filing this lawsuit?   See response to query 7 above.

### D.    Future and Additional Uses of the Subject Property Are Circumstantial Evidence Supporting the District Court's Findings of Fact.

FEB also argues that future and additional uses of the Subject Property do not establish intent at the time of creation.   Opening Brief at 30-32.   This argument is also unavailing.   In support of this argument, FEB cites to the 1928 Revocable License, the Navy's objection to the sale of the Subject Property in 1951, and additional planned uses for the Subject Property in 1966.   This evidence, however, establishes the Navy's claim to, and use of, the Subject Property from 1928 through 1966.   While none of the evidence is contemporaneous to the filling in of the Subject Property, the Navy's asserted ownership and use of the Subject Property around the time it was filled in is circumstantial evidence that supports a finding that the Subject Property was filled in for the United States' own use.

### E.    The District Court Did Not Disregard Relevant Evidence.

FEB argues that the district court committed clear error by ignoring contradictory evidence.   Opening Brief at 33-43.   As explained, the district court was not required to address all evidence introduced or otherwise make findings

44

beyond a reasonable doubt. The district court's findings need only satisfy the preponderance of the evidence standard. Regardless, the district court did not ignore or "disregard" evidence: all the evidence FEB cites to does not impact the district court's findings.

### 1.    TIIF Minutes Are Not Relevant in Determining the United States' State of Mind.

First, FEB argues that, while the district court cited to Navy documents in finding the government's intent with respect to the Subject Property in the 1920s, Opening Brief at 33 (citing (DE155:10¶¶50-56)), the district court committed clear error because it "omitted TIIF's May 16, 1924 response" to the Navy's position, *id.* (emphasis omitted). The fact that TIIF, relying on an outdated and erroneous interpretation of the Equal Footing Doctrine, asserted that Florida owned the Subject Property in 1924, (DE142-24), does not impact the United States' state of mind when it filled in the Subject Property.

### 2.    There Is No "Dispositive Information" Evidencing a Lack of Intended Use on the Part of the United States.

Second, FEB argues the district court "omitted … dispositive information contained in the 1943 Army Corps … post-dredge survey" while discussing the 1940s dredge project. Opening Brief at 34 (citing (DE155:14¶¶81-84, 15¶¶85-86)). In support of this argument, FEB quotes, without citation, its own updated proposed findings of fact, which in turn cite to Exhibit J-40.

(DE154:12¶¶63-64).[19]    FEB argues that Exhibit J-40 "identified areas to serve as future spoil storage locations, but Wisteria Island was not among them."    Opening Brief at 34 (emphasis omitted).

Ironically, even though FEB argues this information is "dispositive," FEB omitted any mention of the information in its proposed findings of fact filed before trial (DE112) and failed to address this information during trial.    While three witnesses called by the United States—Professor Hailey, Dr. Coor, and Tara Wallace, a production branch chief at the National Oceanic and Atmospheric Administration (NOAA)—all testified about Exhibit J-40, none of them testified that the exhibit identifies future spoil locations, and FEB failed to inquire about the same.    The information cited by FEB does not stand for the proposition asserted and is not dispositive.

### 3.    The Navy Never Made a Statement Disdaining the Use of the Subject Property.

Third, FEB argues that the district court failed to "address Navy statements disdaining use as early as 1926."    Opening Brief at 34.    Once again, FEB quotes, uncited, its own updated proposed findings of fact.    (DE154:6¶28).    Moreover, the exhibits FEB cites to in support of this argument do not include statements disdaining use; rather, they merely state that there is no "naval use that is likely to be made of this property in the near future," (DE145-16), while contemporaneously

---

[19] FEB's proposed findings of fact are not evidence.

stating that it is "Naval property" and taking steps to ensure that "permanent works" are not installed that "might hinder or prohibit Naval activities or expansion in this area," (DE145-15). To the extent these exhibits have evidentiary value, it is to support the district court's finding that the Navy exercised control and ownership over the Subject Property, not a statement distaining use. (DE155:13¶70).

### 4. There Is No Evidence that the United States Passed on an Opportunity to Acquire a Deed to the Subject Property.

Fourth, FEB argues the district court failed to address the opportunities the Navy had to acquire title to the Subject Property when the United States acquired title to four other spoil areas. Opening Brief at 35-36. Once again, FEB quotes its own updated proposed findings of fact in support of this argument without citing to the same. (DE154:9¶43-44, 10¶50, 12¶65-66). That said, once again, the quote includes citations to exhibits in the record, specifically Exhibits 142, 150, J-44, and J-49. As discussed, no witness testified as to these exhibits, and these exhibits do not support FEB's argument.[20]

Of note, while FEB attempts to draw an inference of use from the execution of the 1946 deed, and therein implying that filled in lands that were not included in a deed were not used or needed, the 1946 deed itself belies that inference. The 1946 deed excepted "all of that land lying within Fleming Key as withdrawn by Executive

---

[20] See the discussion on pages 40-42. Exhibit J-44 is not discussed there, but Exhibit J-44 merely identifies metes and bounds that correspond to Exhibit J-49, (DE142-44).

Order No. 4060, said Key consisting of 10 acres more or less." (DE143-4:1-2). It is undisputed that this land was used, and continues to be used, by the Navy. In addition, the 1946 deed expressly reserved three-fourths interest in all mineral rights and one-half interest in all petroleum rights, "with the privilege to mine and develop the same" with the State of Florida. (DE143-4:3). It is just as likely, if not more likely, that the United States did not seek to acquire a deed for the Subject Property because it was already reserved under Executive Order 4060 for military use, and therefore, there was no need to, especially considering the negotiated mineral and petroleum rights included in the 1946 deed.

### 5. The United States Never Made a Finding That There Was No Intended Use of the Subject Property When It Was Filled in.

Fifth, FEB argues that the district court committed clear error when it cited to Navy records from the 1950s discussing the Navy's claim and seeking authority to pursue further action in protecting that claim, Opening Brief at 37 (citing (DE155:20¶117, 21¶121)), while failing to cite to other naval correspondences during this period. And once again, FEB quotes its own updated proposed findings of fact in support of this argument, which in turn cites to exhibits. (DE154:14¶¶76-77, 15¶79, 16¶¶82-84, 17¶85, 18¶¶86-88). The exhibits FEB cites

to, Exhibit J-68, J-69, [J-]72,[21] J-73, J-74, J-76, J-77, 199, 200, 202, 206, 213, however, do not undermine the district court's findings.

As explained above in response to query 8, the correspondences in these exhibits merely express the difficulty the Navy had in locating a document created contemporaneously with the filling in of the Subject Property that explicitly identified the intended future use of the Subject Property. Accordingly, the Navy recognized that it "would have a difficult time in proving that this island was built up for Federal use" under the SLA. (DE143-29:2). The exhibits do not establish that the Navy did not have an intended future use when the Subject Property was filled in.

Of course, the Subject Property was filled in before the passage of the SLA (and before the passage of NEPA). There was no reason to identify the future use then contemplated. When the Subject Property was filled in, no one knew that ownership would depend on the expression of an intended future use, and there was no requirement to express one otherwise.

---

[21] The Opening Brief, like FEB's updated proposed findings of fact before it, cites to "[Ex 72]." No such exhibit exists. It is presumed FEB intended to cite to Exhibit J-72.

###### F. The Reservations of the Subject Property for Military Use Are Evidence of the Use of the Subject Property Not Evidence of an Express Retention of the Subject Property.

Finally, FEB argues that "[r]eservations do not trump the [SLA]." Opening Brief at 28. In making this argument, FEB conflates two exceptions to the SLA: the for its own use exception, which the district court relied upon and is therefore the subject of this litigation; and the exception that excludes "all lands expressly retained by or ceded to the United States when the State entered the Union," which was not relied upon and is not the subject of this litigation. The district court did not rely upon the fact that the Subject Property was reserved for military use to establish that the Subject Property was expressly retained by the United States when Florida entered the Union; rather, the district court relied upon the fact that the Subject Property was reserved for military use in concluding that the United States intentionally filled in the Subject Property for that use. The cases FEB cites in support of its argument address the expressly retained exception to the SLA and are, therefore, inapposite.

The district court's findings of fact are more than plausible in light of the record viewed in its entirety. FEB's arguments to the contrary are unavailing. The district court's findings should be affirmed.

50

**Conclusion**

For these reasons, the district court's decision should be affirmed.

Respectfully submitted,

Hayden P. O'Byrne
United States Attorney

By:    *s/Anthony Erickson-Pogorzelski*
Anthony Erickson-Pogorzelski
Assistant United States Attorney
99 N.E. 4th Street
Miami, FL 33132
(305) 961-9296
anthony.pogorzelski@usdoj.gov

Daniel Matzkin
Chief, Appellate Division

Anthony Erickson-Pogorzelski
Assistant United States Attorney

Of Counsel

**Certificate of Compliance**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,649 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements for Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-based typeface using Microsoft Word 2010, 14-point Times New Roman.

**Certificate of Service**

I HEREBY CERTIFY that the foregoing Brief for the United States was filed using CM/ECF on this 2nd day of May 2025, and that, on same day, the foregoing brief was served via CM/ECF on all counsel of record.

*s/Anthony Erickson-Pogorzelski*
Anthony Erickson-Pogorzelski
Assistant United States Attorney

*jp*