## DOCKET NO.: 24-12383-CC

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

## F.E.B. CORP., a Florida Corporation,

Appellant,

v.

## UNITED STATES OF AMERICA,

Appellee.

---

On Appeals from the United States District Court
for the Southern District of Florida
Case No.: 18-10203-civ-Martinez

---

## APPELLANT'S REPLY BRIEF

---

**TARA A. CAMPION**
**BRUCE S. ROGOW, P.A.**
1199 S. Federal Hwy., #212
Boca Raton, FL 33432
PH: 954.767.8909

**BRUCE S. ROGOW**
**BRUCE S. ROGOW, P.A.**
P.O. Box 749
Cedar Mountain, NC 28718
PH: 954.767.8909

24-12383-CC
*U.S. v. F.E.B. Corp.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-2(b), undersigned counsel hereby certifies that

no corporation or publicly held corporation owns 10% or more of F.E.B. Corp.'s

stock,  and the following is a complete list of all persons and entities known to have

an interest in the outcome of this appeal:

1. Bruce S. Rogow, P.A. – Counsel for the Appellant

2. Campion, Tara A. – Counsel for the Appellant

3. Erickson-Pogorzelski, Anthony – Trial Counsel for the Appellee

4. F.E.B. Corp. – Appellant

5. Grey, Michael – Appellant Counsel for the Appellee

6. Rogow, Bruce S. – Counsel for the Appellant

7. United States of America – Appellee

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ............................................ C1

TABLE OF CITATIONS ........................................................... ii

RESPONSE TO GOVERNMENT'S STATEMENT REGARDING ORAL
ARGUMENT ........................................................................... iii

INTRODUCTION ..................................................................... 1

ARGUMENT ........................................................................... 4

   I.   THE GOVERNMENT FAILS TO ACKNOWLEDGE THE EXISTENCE
      OF DOCUMENTS THAT ESTABLISH THERE WAS NO INTENDED
      USE OTHER THAN DUMPING DREDGE SPOILS IN THE 1920s AND
      1940s ........................................................................ 4

  II.   HAILEY'S *IPSE DIXIT* ................................................... 6

 III.  THERE ARE TWO SPECIFIC TIME PERIODS: 1920-1923 (2.8 acres
      reduced to 1.7); 1940-1943 (21 acres above water, 18 acres below) ............ 10

      A. Frankford Bank is Not the Subject Property; President Coolidge's
         1924 Executive Order 4060 "Reservation" is not Relevant ............... 10

      B. The Navy Recognized No Proof of Intent to Use .............................. 15

 IV.  INTENT IS PART OF THE STATUTORY STANDARD .......................... 16

  V.  THE GOVERNMENT, NOT FEB, HAD THE BURDEN OF PROOF ....... 17

 VI.  FINAL THOUGHTS ........................................................... 18

CONCLUSION ...................................................................... 21

CERTIFICATE OF COMPLIANCE ................................................ 22

CERTIFICATE OF SERVICE .................................................... 22

# TABLE OF CITATIONS

## Cases

*Anderson v. City of Bessemer City, North Carolina*,
    470 U.S. 564, 105 S.Ct. 1504, 84 L. Ed.2d 518 (1985)...........................1, 21

*Chapman v. Procter & Gamble Distributing, LLC*,
    766 F.3d 1296 (11th Cir. 2014) ......................................................................8

*United States v. F.E.B. Corp.*,
    52 F.4th 916 (11th Cir. 2022) (*FEB II*)...................................................*passim*

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ......................................................................7

*U.S. Bank Nat. Ass'n ex rel CWCapital Asset Management LLC v.*
    *Village at Lakeridge, LLC*,
    583 U.S. 387, 138 S.Ct. 960, 200 L.Ed. 2d 218 (2018)..........................16, 17

*Ward v. Hobart Manufacturing Co.*,
    450 F.2d 1176 (5th Cir. 1971) .......................................................................8

## Statutes

43 U.S.C. §1313(a) ..........................................................................................16, 17

## Additional Sources

Merriam-Webster, 2025 ........................................................................................1

## RESPONSE TO GOVERNMENT'S STATEMENT
## <u>REGARDING ORAL ARGUMENT</u>

This is the third time the Court has considered the question of application of the Submerged Lands Act to Wisteria Island. The government says that "the decisional process would not be significantly aided by oral argument." Answer Brief at 4. That statement reflects either doubt or overconfidence. There is no basis here for overconfidence. There is a basis for doubt. Oral argument would assist the Court.

# INTRODUCTION

The government argues that dredge spoil was "intentionally placed" on the Subject Property "for its own uses of utility, protection, and strategy" and that "the greater weight of the evidence establishes that the United States filled in the Subject Property for its own use." Answer Brief at 14-15.[1] It argues that the adoption of its proposed findings of fact is not clearly erroneous; that the findings are "plausible" and may not be reversed, even if this Court "would have weighed the evidence differently." *Id*. at 32 (citing *Anderson v. City of Bessemer City, North Carolina*, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L. Ed.2d 518 (1985)).

"Plausible" is defined as "superficially fair, reasonable, or valuable but often deceptively so." See Merriam-Webster, 2025.[2] "Clear error" requires there to be a definite and firm conviction that a mistake has been made. *Anderson*, 470 U.S. at 573-74 (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). The Findings of Fact and Conclusions of Law, based nearly verbatim on those submitted by the government, are not, in light of the historical evidence, both at the time of the deposits of dredge spoils, and the United States subsequent actions, and non-actions for 100 years, "plausible." They are clearly erroneous.

---

[1]    References to pages in the Answer Brief are to the ECF pagination.
[2]    Available at https://www.merriam-webster.com/dictionary/plausible

The government had no motive or purpose to *use* the dredge spoils it placed in 1920 and 1940 off of Key West. The government's only motive and purpose to dredge at those times was to deepen the channel and the harbor for ease of Naval vessels movement and to improve the useability of the sea-plane basin. But the spoil piles it created that would become the Subject Property were not intentionally created to be *used*.

And that is the test: "[w]hether the United States had an intended use for Wisteria Island when the United States created it." *United States v. F.E.B. Corp.*, 52 F.4th 916, 927 (11th Cir. 2022) (*FEB II*).

The government's Answer Brief says it is "plausible in light of the record viewed in its entirety" that the Subject Property was filled in for "utility . . . protection … (i.e., 'non-use'), as a barrier island providing protection . . . and for strateg[y]." Answer Brief at 13-14. Not so. No evidence supports filling in for "non-use." To be sure, one can intentionally create property for "non-use," i.e., as a buffer or for privacy, but nothing in this record supports or suggests that purpose. As we show below, the government's intentional decision to not accept the property from the Florida Trustees Internal Improvement Fund (TIIF), its own investigation which found no intent to use, and its recognition that Wisteria Island was a "privately owned spoil island" which could only be obtained through condemnation

2

proceedings, belies "non-use" as an intended "use" at the time of creation. (DE 147-4) (image below).



# ARGUMENT

## I
## THE GOVERNMENT FAILS TO ACKNOWLEDGE THE EXISTENCE OF DOCUMENTS THAT ESTABLISH THERE WAS NO INTENDED USE OTHER THAN DUMPING DREDGE SPOILS IN THE 1920s AND 1940s

The Answer Brief does not address exhibits which compel the conclusion that the government had no intent that meets the Submerged Lands Act test. They establish that the government intentionally failed to accept ownership of Wisteria when it was created and the government's investigation after the passage of the Submerged Lands Act concluded that there was no intent to use Wisteria when it was created.

We summarize some of them here:

- January 10, 1942 memorandum from the Commandant of the Key West Naval Base to the Judge Advocate General of the Navy reflecting agreement by the State of Florida to give title to any dredge spoil area to the Navy after providing metes and bounds descriptions.  (DE 145-38)

- July 6, 1944 memorandum from the Commander of the Key West Naval Base to the Chief of the Bureau of Yards and Docks with the metes and bounds descriptions of four spoil islands – BUT WISTERIA ISLAND WAS NOT INCLUDED (DE 142-44)

- May 7, 1946 Letter from the head of Real Estate Division, Bureau of Yards and Docks to the Commissioner of the Florida Department of Agriculture confirming the sale of four spoil islands

4

to the Navy, and a copy of the Deed – WISTERIA IS NOT INCLUDED. (DE 146-4)

- November 20, 1953 letter from the Department of the Interior, Bureau of Land Management to Admiral Jelley, pointing out the Submerged Lands Act and the "for its own use" exception and stating "in the event of conflicting claims which cannot be reconciled by agreement between the United States and the State of Florida recourse must be had to the normal judicial procedure to establish the right or title to the areas in question." (DE 146-14)

- December 14, 1956 memorandum from the Commanding Officer at Key West Naval Base to the District Public Works Officer concerning Wisteria Island, advising "the subject land was deposited as spoil incidental to the deepening of the ship channel. There is nothing on record locally to indicate whether or not it was the intention of the Navy to use the island after it was created. . . . there was no indication that a specific use of the island was contemplated." (DE 143-31, 143-32)

These and other Exhibits reflecting the Navy's disinterest in the dredge spoils of Wisteria and recognition that it was privately owned were discussed in FEB's Initial Brief at 33-43.

The government's Answer Brief is silent regarding the historical documents which address the precise question presented here. Nor did the Findings of Fact address that evidence. Those failures to acknowledge and discuss the textual evidence of the lack of intent to use, the findings that there was no intent to use, and the recognition that the Subject Property was acknowledged to be privately owned

speaks volumes. There was no use contemplated at the time of creation of the Subject Property. In fact, there has never been any use of the Subject Property by the government except for the three times (2004-2006) it leased the property from FEB for training purposes. (DE 147-33).

## II
## HAILEY'S *IPSE DIXIT*

Professor Hailey was the government's star witness: "Yes. Just specifically the spoil being deposited there is a use." (DE 149:120 lns. 23-24). That *ipse dixit* was the crux of the government's case. "Utility," "protection," "strategy," were Hailey's construct which were embodied, word for word, in the Findings of Fact and Conclusions of Law. (DE 155; Answer Brief at 37).  But Hailey saying it was so, does not make it so. Despite never mentioning him by name, Hailey's conclusions were the linchpin of the government's case and the court's findings.

He created his conclusions out of whole cloth, not out of the historical documents, not out of the Submerged Lands Act language, not out of this Court's test "[w]hether the United States had an intended use for Wisteria Island when the United States created it." *FEB II*, 52 F.4th 916 at 927. Hailey decried the need to consider the Submerged Lands Act language. He disdained knowledge of this Court's opinion and the intent-to-be-used test. (DE 149:96 lns. 19 – 149:99 lns. 25).

Like Peter Sellers' character in "Being There" (1979), Hailey's view of the mere presence of dredge spoil was enough. Non-use is a use: "Yes. Just specifically the spoil being deposited there is a use." *Id*. at 120 lns. 23-24.

Hailey did not consider the undisputed evidence that the Navy never ordered nor obtained a metes and bounds description of Wisteria;  the Navy never requested a deed to Wisteria from TIIF;  the Navy did not include Wisteria's description in the deed the Navy obtained from the TIIF in 1946;  that in the 1951- 1953 Shore Station Plans the Navy suggested it could use Wisteria for fuel storage if the land was acquired from its private owners (DE 143-20); that after a detailed investigation conducted by the Navy from February 1954 to December of 1956, the Navy concluded that "there is nothing on record locally to indicate whether or not it was the intention of the Navy to use the island after it was created." (DE 143-31, 143-32).

Hailey's assertions were his own creations. An "expert's bald assurance of validity is not enough." *United States v. Frazier*, 387 F.3d 1244, 1260-1261 (11th Cir. 2004) (citing *Daubert v. Merrell Down Pharmaceuticals, Inc*. (on remand), 43 F.3d 1311, 1319 (9th Cir. 1995)).[3] The trial court's gatekeeping function requires

---

[3]    Professor Hailey, a professor of Architecture, is a good fellow and wrote a book on spoil islands which included 26 pages about Wisteria Island. Hailey was tendered as "an expert in the field of material culture and cultural landscapes."(DE 149 at 31:2-4). But "intent at time of creation" calls for a different expertise: reading the minds of long dead government employees of the United States. Counsel for FEB

more than simply 'taking the expert's word for it.' Fed. R. Evid. 702. . . . the gatekeeping role requires a district court to make a reliability inquiry, . . ." *Id.*

> We are fully aware of the broad discretion vested in the trial court in passing upon the qualifications of an expert, especially in non-jury cases where the judge is presumed to consider only legally admissible evidence. While we have serious doubts as to the qualifications of Dr. Carley to testify as to the design of meat grinders and the admissibility of his testimony as it related to the grinder involved here, we are reluctant to reverse on the evidentiary ruling of the trial court. Nevertheless, even giving full consideration to the foregoing principles we are clearly convinced that the trial judge gave undue weight and consideration to this testimony. In our view the testimony of Dr. Carley does not rise to the level of substantial evidence sufficient to support the conclusion of the court that Hobart was negligent in the design of the grinder involved. Nor do we think that the other evidence is sufficient to support such a conclusion. Accordingly, it is our judgment that the finding of negligence in the design of the grinder is clearly erroneous.

*Ward v. Hobart Manufacturing Co*., 450 F.2d 1176, 1182-1183 (5th Cir. 1971).

"[O]ne may be considered an expert but still offer unreliable testimony."

*Chapman v. Procter & Gamble Distributing, LLC*, 766 F.3d 1296, 1304-05 (11th Cir. 2014) (internal citations omitted). "[N]either *Daubert* nor Federal Rule of Evidence 702 requires a trial judge to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. Instead, the judge is free to conclude

---

attempted to have Hailey's testimony stricken, but was denied by the court and instructed to "move on." (DE 149:105 ln. 6 – 106 ln. 5).

that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* (internal citations omitted). "The district judge has the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 1306 (internal citations omitted).

Hailey's opinions were unreliable because there was too wide a gap between what the documents said, and the conclusions he reached. And his opinions were too generalized to be relevant to the specific issue of intent at time of creation. The trial court adopted Hailey's views and interpretations of the documents Hailey chose to consider. But the documents he chose were an incomplete record of historical events, and other documents were willfully ignored in both his book and in his testimony.

Asked whether the written evidence of naval authorities who concluded there was no intent to use at the time of creation might have been of interest to readers of his book, he answered: "Potentially." (DE 149:117 lns. 3-9). Hailey's "oversight" underscores the error of resting on his views.

## III
## THERE ARE TWO SPECIFIC TIME PERIODS:
## 1920 – 1923 (2.8 acres reduced to 1.7);
## 1940 – 1943 (21 acres above water, 18 acres below)

**A.  Frankford Bank is Not the Subject Property; President Coolidge's 1924 Executive Order 4060 "Reservation" is not Relevant**

The government asserts the district court's findings *vis a vis* protection is supported by the greater weight of the evidence because "[d]redge spoil was placed on the Subject Property to augment the protection the Subject Property provided for navy operations from both natural and manmade incursions," and that "[t]he United States placed spoil on the Subject Property with federal use in mind, including non-use as a protective feature. (DE 155:22 ¶¶ 129, 131)." Answer Brief at 40-41.

The documents Hailey used as the basis for his "protection" theory do not carry the weight he, the government, and the district court assigned to them. The 1908, 1916, 1917, 1918 references to Frankford Bank are not references to what would become the 1923 dredge spoil pile. (DE 142-5, 142-6, 142-9, 142-12, 141-18). The documents discuss either Frankford Bank or the island of Key West, which Hailey improperly interpreted to mean specifically the Subject Property. That 2.8 acre 1923 dredge spoil pile is not "Frankford Bank;" they are not synonymous.

In the 1908 letter, the Navy discusses wanting to oversee the Army's dredging operation at Fort Taylor to ensure Frankfort Bank was not depleted. (DE 142-6). The 1916-1917 documents concerned lands bordering the island of Key West and

10

included both Frankford Bank and Fleming Key. (DE 141-18). They did not portray an intent to create the Subject Property. In fact, a December 1, 1916 letter from the United States Engineer's Office to the Chief of Engineers at the Army Corps discussed the benefits of removing all of the southern portion of Frankfort Bank to widen the channel – the very portion of Frankford Bank upon which the Subject Project would eventually lie. (DE 145-9; see also DE 145-8, 145-10, 145-11).

As for FEB's witnesses "support[ing] the district court's findings that the Subject Property was used for 'non-use'" (Answer Brief at 43), that is unsupported by the testimony. While Finkbeiner was aware of other situations where spoil islands may have been used for wave attenuation and Captain Dobson was familiar with the Navy in Jacksonville purchasing property surrounding airfields intentionally to keep them vacant, neither testified that "non-use" was the *raison d'etre* for the Subject Property. Hailey's conclusions, and the trial court's Findings, that the Subject Property was used for "protection" had no basis in fact and was clearly erroneous.

The 1908 - 1918 proffered documents relied upon by Hailey speak generally of breakwaters and natural barriers but they shed no light on the creation or use of the 1923 dredge spoil pile. Concerns about private ownership were raised for the first time in 1924, *after* the 2.8-acre spoil pile was created. (DE 142-28; see also DE 143-12 (1951 letter regarding private ownership concerns *after* 1943 island creation)). So too was the 1924 request for Executive Order 4060, "all the islands,

11

keys, harbors and shoals adjacent to and in the vicinity of the island of Key West, Florida, . . . reserved for use of the Navy Department for naval purposes, subject to any existing vested rights in and to the same," made *after* creation. (DE 142-29). The post-creation "reservation" does not address the intent to use at time of creation. Nor does it survive the 1953 Submerged Lands Act which specifically insured that "built up with intent to use" was the only "reservation."

Even more telling is the government's failure to acknowledge the June 1926 letter stating "[t]he Navy Dept has in contemplation no naval use . . . that is likely to be made of this property in the near future. . . ."  See Initial Brief at 11 (DE 145-16; see also DE 145-17, 145-19). And indeed, no use was ever made of it by the government, just as no use has ever been made of the Subject Property for over 100 years (other than the three occasions during 2004-2006 when the Navy actually obtained Licenses from FEB to use Wisteria for short periods for training purposes. (DE 147-33)). That too bespeaks the irony of the government now saying it never had to "act on a property." Answer Brief at 54-55.

Clearly, the closest in time and place historical documents do not support that at the time of creation of the small spoil bank used by the Lowe Fish Company there was any intention to be used by the government for its own use. Nor was it ever used.

Regarding "utility," the government argues the "[t]he documentary evidence cited in the Statement of Facts alone warrants affirming the district court's finding," and offers Professor Hailey and Dr. Coor's testimony to bolster their position. Answer Brief at 36. But nothing in those pages, testimony, or evidence demonstrate *intent at time of creation*. They reflect the common belief that the Subject Property would have been a useful location for the spoil disposal. The experts, and the government, agreed, that the Army Corps would use the "cheapest, easiest option for disposal" of spoil, that were "convenient and not specifically designated." Answer Brief at 38.

Dr. Coor's referenced testimony (DE 149:187 lns. 5-19) establishes only that during the 1940's dredge project, spoil that would become the Subject Property was placed in the large "Spoil Area B." This says nothing of intent for future use of the Subject Property. No evidence supported any intention to use it as a designated place to put future spoils. Yes, the government placed approximately 2.7 acres of spoil in the area between 1920 and 1923. By 1940, that pile diminished to 1.7 acres. Spoil was placed nearby between 1940 and 1943, but never again.

Where the government intended to create dredge spoils to be used, title was sought and the intentionally planned uses were described: filling in of Fleming Key as general magazine storage (DE 145-33, 145-24); filling in Salt Pond and surrounding areas for operation of the naval base (DE 145-32, 145-32); filling in

area adjacent to Parcel 3, south of and adjacent to Naval Station, Fleming Key, Dredgers Key (DE 143-2 at 5-19). Nothing in the record supports the district court's conclusion that the government specifically intended to use the Subject Property as a future place to store spoil in the 1920s or the 1940s.

The Answer Brief and the district court disregard direct evidence that Wisteria Island was *specifically not designated* as a future spoil location. (DE 142-40 at 34).[4] They also disregard that in 1954-1955, when the Navy considered placing fuel storage tanks on Wisteria, that it would need to acquire the island because the Navy acknowledged it was privately owned. (DE 143-20, 143-27; DE 146-17, 146-19 through 146-25, 146-27; DE 147-1 through 147-4).

In fact, in the 1960s when Wisteria was being considered as a spoil location, the government sought permission from the then owners, but consent was not given. (DE 147-21 through 147-23).

The finding that the Subject Property was filled in for "strategic" purposes suffers from the same infirmities noted above. Captain Regoli's testimony is no more than an echo of Hailey's conclusions, and her testimony that the Navy "desires" to have the Subject Property for "current and future" use has no bearing on intent at time of creation. Answer Brief at 45 (citing DE 150:12 lns. 10-13).

---

[4]     1943 Army Corps of Engineers post-dredge survey, map of spoil areas identified for "Maintenance Dredging;" Wisteria is not labeled.

**B.      The Navy Recognized No Proof of Intent to Use**

Hailey left unanswered the question that was thoroughly investigated, resolved, and directly addressed the issue in this case: whether Wisteria Island was built up by the United States for its own use. That question was asked and answered by the Navy in 1956:

> The subject land was deposited as spoil incidental to the deepening of the ship channel. There is nothing on record locally to indicate whether or not it was the intention of the Navy to use the island after it was created. . . . there was no indication that a specific use of the island was contemplated.

DE 143-31, see also 143-32.  That investigation and conclusion by Navy officers presciently addressed the intention question.

> But if the United States just dumped the spoils in the area with no intention of ever depositing further dredge spoils (or otherwise using Wisteria Island), then the United States did not create Wisteria Island 'for its own use.' Rather, it just discarded the spoils in a pile that became known as Wisteria Island. And that does not qualify as 'for its own use.'

*FEB II* at 927-928.

The 1951 Navy Speed Letter that the government sets forth on page 29 of its Answer Brief (DE 143-12) speaking of a "dangerous security risk to allow this property to fall in the hands of private developers . . . the strategic location of this spoil area makes its use for military purposes highly possible, and its use for a fuel storage area is now under consideration," proves that: 1) the government had no

15

intent to use in 1940; 2) it failed to acquire the property as it could have in 1943 merely by providing metes and bounds to the TIIF; and 3) there was no indication that a specific use of the island was ever contemplated at the time of its creation.

In 2011, the Navy, *via* a news release from the Naval Air Station Key West, stated that "Research concludes Navy has no claim to Wisteria Island," and that "[t]he Navy will not be conducting further research as they do not have any property interest." (DE 147-36).

The Wisteria spoil was dumped in the 1920s and 1940s, just as the Corps of Engineers witness testified, because it was a "pick and shovel" operation – nothing more. (DE 150: 64 ln 16 – 65 ln 8). That was (is) not enough to establish intended use under the Submerged Lands Act.

**IV**
**INTENT IS PART OF THE STATUTORY STANDARD**

*FEB II* parsed the language of §1313(a)'s exception "for its own use" to mean "whether the United States had an intended use for Wisteria Island when the United States created it." *FEB II*, 52 F.4th at 926. Here, the Court must necessarily evaluate whether the "factual findings satisfy the statutory standard."

This thus presents a mixed question of law and fact.

> What is the nature of the mixed question here and which kind of court ([trial] or appellate) is better suited to resolve it. See *Miller v. Fenton*, 474 U.S. 104, 114, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (When an 'issue falls somewhere between a pristine legal standard and a simple historical

16

fact,' the standard of review often reflects which 'judicial actor is better positioned' to make the decision). Mixed questions are not all alike . . . some require courts to expound on the law, particularly by amplifying or elaborating on a broad legal standard. When that is so – when applying the law involves developing auxiliary legal principles of use in other cases – appellate courts should typically review a decision *de novo*.

*U.S. Bank Nat. Ass'n ex rel CWCapital Asset Management LLC v. Village at Lakeridge, LLC*, 583 U.S. 387, 138 S.Ct. 960, 966-67, 200 L.Ed. 2d 218 (2018) (internal citations omitted).

The level of intent that the government was required to prove was specific intent: "for its own use." 43 U.S.C §1313(a). This Court is in the best position to determine whether the government met the statutory standard of actual intended use at the time of creation that Congress established and this Court confirmed. The Factual Findings and Conclusions of Law are subject to *de novo* review. *Id*.

## V
## THE GOVERNMENT, NOT FEB, HAD THE BURDEN OF PROOF

The government wrongly asserts that FEB had the burden to "establish[ ] that the United States filled in the Subject Property by accident or without intent." Answer Brief at 50. This attempt to shift the burden of proof is contrary to *FEB II* and to the statutory standard. The government failed to meet its high burden of showing the requisite specific intent at time of creation – in the 1920s and the 1940s – to use the Subject Property.

17

FEB posed the questions which any reasonable person or entity would ask in divining intent. (Initial Brief at 20-22). Was it reasonable for the government to do nothing to secure ownership for the "utility, protection, and strategy" of the Subject Property for nearly 100 years simply because it felt "it did not need to." The notion that the Navy thought "it did not need to [do anything to secure ownership of the Subject Property]" (Answer Brief at 54) is belied by its 100 years of non-use, its disdain for the processes which could have resolved the claim to ownership, its recognition that taxes were being paid by another, and last, but not least, its recurrent leasing of the property from FEB on several occasions. (DE 147-33).

The government's "answers" to the common sense questions posed by FEB (Answer Brief at 52-56) demonstrate the inconsistent and implausible nature of Captain Regoli's testimony. The "common sense queries" emphasized the incongruity between the government's notions of "utility, protection, strategy" and its behavior (and lack of interest) over a century.

## VI
## FINAL THOUGHTS

The government pooh-poohs FEB's 10 "Common Sense" questions that undermine its case. Answer Brief at 52-56.

1.    That the Army Corps "had no reason to communicate what any future use was" (Answer Brief at 52) actually underscores that *no part* of the government

18

articulated any reason for the spoil placement other than it being a "pick and shovel" operation.

2.    The TIIF minutes (DE 145-30) did not need an expository witness. The Navy application to simply deposit spoil material on state owned lands reflected only that. No other use or future use was suggested.

3.    Exhibit 150 (DE 145-38) demonstrates that the government could have sought title to spoil areas. If the Navy thought the Subject Property was of any use to it, why did it not provide the metes and bounds for that property. Saying that "there is no evidence that the Subject Property was in the Salt Pond Key area" (Answer Brief at 53) is a non-sequitur response to the question of why the Navy did not seek to obtain record title to the Subject Property when it could have had it merely by providing metes and bounds of the deposit area.

4.    The government does not dispute that Exhibit J-49 (DE 143-4) shows that when the Navy wanted property it provided metes and bounds.  Saying "no witness testified about Exhibit J-49" (Answer Brief at 53) is irrelevant. No witness was necessary; the document speaks for itself. The Navy did nothing to suggest an interest in the Subject Property.

5.    Again, Exhibit J-40 (DE 142-40) did not need witness testimony. The Subject Property was never designated as a future spoil location but other dredge spoil areas in which the Navy had an interest were so designated. Moreover, in the

19

1960s, when the government wanted to use spoil areas designated for "Maintenance Dredging," they obtained Perpetual Spoil Disposal Easements from TIIF. (DE 147-8, 147-16 through 147-20, 147-24). No such easement was ever obtained for Wisteria Island.

6.      Why didn't the United States take action in 1951 when TIIF noticed its intent to sell the Subject Property, other than to "object to the sale." Answer Brief at 54. Would not a party believing it had a use for the property sit on its hands for half a century before taking action? The government's 1951 non-action belies its present contention that it had any use for the Subject Property.

7.      Is saying we "did not need to" take action (Answer Brief at 54) a credible response to property that is allegedly important for utility, protection, and strategy and the security of the United States of America, her ships, her harbor, and her people? Would not the government have sought its so important use claim?

8.      Why did the United States fail to act after the Submerged Lands Act and its own investigation put the Navy on notice that condemnation proceedings would be required to acquire the island. (DE 143-28, 143-29). "[W]e didn't have to" is inconsistent with the notion that something so important would not be pursued.

9. and 10.    "We didn't have to" is the government's last gasps. They defy common sense.

> Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it.

*Anderson*, 470 U.S. at 575.

## <u>CONCLUSION</u>

The government failed to prove that "the United States had an intended use for Wisteria Island when the United States created it." *FEB II*, 52 F.4th at 927. FEB proved, even though it was not its burden, that the United States had no intended use for Wisteria when it created it. The district court's Findings of Fact and Conclusions of Law were implausible and clearly erroneous.

The Final Judgment should be reversed and judgment quieting title entered in favor of FEB Corp.

Respectfully submitted,

<br>

TARA A. CAMPION
FL. Bar No.: 90944
**BRUCE S. ROGOW, P.A.**
1199 S. Federal Hwy., #212
Boca Raton, FL 33432
PH: 954.767.8909
tcampion@rogowlaw.com

*/s/ Bruce S. Rogow*
BRUCE S. ROGOW
FL. Bar No.: 067999
**BRUCE S. ROGOW, P.A.**
P.O. Box 749
Cedar Mountain, NC 28718
PH: 954.767.8909
brogow@rogowlaw.com

## **CERTIFICATE OF COMPLIANCE**

I HEREBY CERTIFY that this Reply Brief complies with the type-volume limitation set forth in FRAP 32(a)(7)(B)(i) and contains 4,840 words.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 23, 2025 I electronically filed the foregoing Initial Brief with the Clerk of Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Bruce S. Rogow*